198 P.3d 1021 (2009)
John L. HALE and Robbin Hale, husband and wife, Petitioners,
v.
WELLPINIT SCHOOL DISTRICT NO. 49, a municipal corporation, Respondent.
No. 80771-0.
Supreme Court of Washington, En Banc.
Argued October 21, 2008.
Decided January 15, 2009.
*1022 Paul James Burns, Attorney at Law, Spokane, WA, for Petitioners.
Michael Early McFarland Jr., Patrick Mark Risken, Attorney at Law, Spokane, WA, for Respondent.
Sean M. Phelan, Frank Freed Subit & Thomas, LLP, Seattle, WA, Amicus Curiae on behalf of Washington Employment Lawyers Association.
Michael Craig Subit, Beth A. Bloom, Sean M. Phelan, Frank Freed Subit & Thomas LLP, Seattle, WA, Amicus Curiae on behalf of Senators Adam Kline et al.
Elizabeth Christina Beusch, Attorney General's Office, Government Compliance Division, Olympia, WA, Amicus Curiae on behalf of Washington State Human Rights Commission.
CHAMBERS, J.
¶ 1 Until 2007, the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW, contained no definition of the term "disability." In 2006, this court found that the meaning of "disability" as used in the WLAD was consistent with the definition found in the federal Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12209(ADA). McClarty v. Totem Elec., 157 Wash.2d 214, 137 P.3d 844 (2006). In reaction, *1023 the legislature rejected the McClarty definition and amended the WLAD to provide a new statutory definition of "disability." Being careful not to reverse McClarty, the legislature explicitly declared the new statutory definition applied retroactively to causes of action occurring the day before the McClarty opinion was filed and to causes of action occurring on or after the effective date of the amendment. We are asked to determine whether this retroactive amendment to a statute previously construed by this court violates separation of powers. We hold that under the facts of this case, it does not. We reverse the trial court and remand for further proceedings.

FACTS AND PROCEDURAL HISTORY
¶ 2 John Hale was hired by the Wellpinit School District (Wellpinit) in February 2002 to provide student support services at Wellpinit High School. In May 2002, Hale was transferred to Fort Simcoe, a satellite school being opened by Wellpinit in White Swan, Washington. Hale provided classroom support and helped with any software problems that arose at Fort Simcoe.
¶ 3 During his time with Wellpinit, Hale came to believe that some of his supervisors were aggravating a medical condition. From February 2002 through May 2002, Hale claims he was subject to abusive conduct from his supervisor, Magne Kristiansen, including being criticized for problems with classroom computers and being made to feel "ignorant or stupid." Clerk's Papers at 55-60. After his move to Fort Simcoe, Hale continued to have problems with Kristiansen and another supervisor, Principal Phyllis Magden. These issues allegedly exacerbated Hale's previously diagnosed generalized anxiety disorder.
¶ 4 On August 25, 2002, Hale sent a letter to Wellpinit Superintendent Reid Riedlinger informing Riedlinger that he was having problems with his supervisor and that those problems were having an adverse effect on his health. On January 3, 2003, Hale sent a letter to the Wellpinit School Board (Board) concerning Riedlinger's failure to respond to the previous letter and outlining other issues he was concerned about at Fort Simcoe. Included with the letter to the Board was a December 20, 2002, letter written by Hale's physician, Dr. Robert Wigert, explaining that Hale suffered from an anxiety disorder and depression. Feeling that the work environment was exacerbating his condition and that he was receiving no help in trying to improve the situation, Hale left his position with Wellpinit on March 20, 2003.
¶ 5 In 2006, Hale filed suit in Stevens County Superior Court against his former employer, Wellpinit, alleging negligent infliction of emotional distress, breach of contract, and disability discrimination under the WLAD. The WLAD claim alleged that Hale was disabled and that Wellpinit had failed to accommodate his disability by failing to intervene and stop the abusive conduct Hale felt was exacerbating his anxiety disorder. Wellpinit filed a motion for partial summary judgment alleging that Hale had failed to establish that he was disabled under the WLAD. On March 30, 2007, the trial judge granted Wellpinit's motion for partial summary judgment on the WLAD claim, finding that there was no issue of material fact regarding whether Hale was disabled as that term is defined under McClarty.
¶ 6 In April 2007, following the dismissal of Hale's accommodation claim, the legislature passed Substitute Senate Bill 5340, 60th Leg., Reg. Sess. (Wash.2007) (S.S.B.), which statutorily defined "disability" under the WLAD. The new legislative act explicitly declared that the definition applied retroactively. Hale filed a motion for reconsideration arguing that in light of the legislature's amendment of the WLAD and its retroactive effect, partial summary judgment should have been denied because his condition qualified as a disability under the new definition. The trial judge, relying largely on In re Personal Restraint of Stewart, 115 Wash. App. 319, 75 P.3d 521 (2003), denied the motion for reconsideration finding that S.S.B. 5340 violated the separation of powers doctrine by attempting to reverse this court's interpretation of the WLAD in McClarty. The superior court certified that the separation of powers issue involved a significant question of law under the constitution of the state of Washington and that immediate review *1024 would materially advance the termination of litigation. We agreed and accepted review under RAP 2.3(b).

LEGISLATIVE BACKGROUND
¶ 7 Prior to the legislature's most recent amendment, the WLAD itself contained no definition of the term disability. However, the Human Rights Commission (HRC) had earlier promulgated a definition, which stated in part that "a person will be considered to be disabled by a sensory, mental, or physical condition if he or she is discriminated against because of the condition and the condition is abnormal." WAC 162-22-020(2). In 2000, we reviewed the HRC definition and held that it was circular and "unworkable when an employee's claim is based upon an accommodation theory." Pulcino v. Fed. Express Corp., 141 Wash.2d 629, 641, 9 P.3d 787 (2000). Instead we found that an accommodation claimant could satisfy the "`handicap'[[1]] element of his or her claim by proving that (1) he or she has/had a sensory, mental, or physical abnormality and (2) such abnormality has/had a substantially limiting effect upon the individual's ability to perform his or her job." Id. The HRC definition remained in force for any claims under the WLAD not based on an accommodation theory.
¶ 8 A closely divided court changed the definition of "disability" in 2006 in McClarty. There we rejected both the HRC definition and the definition we had adopted six years earlier in Pulcino in favor of the definition used by Congress in the ADA. McClarty, 157 Wash.2d at 228, 137 P.3d 844. Specifically, we found that the definition of "disability" employed by the ADA was better supported by the plain language of the WLAD's text and the legislature's intent. Id. Instead of requiring plaintiffs to prove they had an abnormality that substantially limited their ability to perform their job, we construed the WLAD as requiring that a plaintiff show he had "a physical or mental impairment that substantially limits one or more of his major life activities." Id. The McClarty definition provided a single definition of "disability" to be applied throughout the WLAD.[2]Id.
¶ 9 The legislature responded to our decision in McClarty by enacting S.S.B. 5340 and statutorily defining the term "disability." The legislature specifically rejected the definition of "disability" adopted in McClarty stating:
The legislature finds that the supreme court, in its opinion in McClarty v. Totem Electric, 157 Wash.2d 214, 137 P.3d 844 (2006), failed to recognize that the Law Against Discrimination affords to state residents protections that are wholly independent of those afforded by the federal Americans with Disabilities Act of 1990, and that the law against discrimination has provided such protections for many years prior to passage of the federal act.
LAWS OF 2007, ch. 317, § 1. The legislature provided that:
(a) "Disability" means the presence of a sensory, mental, or physical impairment that:
(i) Is medically cognizable or diagnosable; or
(ii) Exists as a record or history; or
(iii) Is perceived to exist whether or not it exists in fact.
Id. § 2(25) (codified as RCW 49.60.040(25)(a)). In addressing "impairment" as it relates to a reasonable accommodation claim under the WLAD the statute now states:
(d) Only for the purposes of qualifying for reasonable accommodation in employment, an impairment must be known or shown through an interactive process to exist in fact and:
(i) The impairment must have a substantially limiting effect upon the individual's *1025 ability to perform his or her job, the individual's ability to apply or be considered for a job, or the individual's access to equal benefits, privileges, or terms or conditions of employment.
RCW 49.60.040(25)(d)(i). The legislature also explicitly applied the new definition retroactively stating, "[t]his act is remedial and retroactive, and applies to all causes of action occurring before July 6, 2006, and to all causes of action occurring on or after the effective date of this act." Laws of 2007, ch. 317, § 3. McClarty was published on July 6, 2006. The effect of this provision was to carefully carve out a window of time during which claims would still be controlled by the definition of "disability" we announced in McClarty. The new definition, among other things, eliminated the requirement that the plaintiff demonstrate that the allegedly disabling condition limits "one of his major life activities." It also broadens the meaning of disability and reinstates some of the language that was used in both the HRC definition and in Pulcino. The amendment applies the Pulcino standard to accommodation claims stating the "impairment must have a substantially limiting effect upon the individual's ability to perform his or her job." RCW 49.60.040(25)(d)(i).

STANDARD OF REVIEW
¶ 10 We are asked to determine if the retroactivity of RCW 49.60.040(25) violates the constitutional doctrine of separation of powers. We review all constitutional challenges de novo. State v. Jones, 159 Wash.2d 231, 237, 149 P.3d 636 (2006). We also review a grant of partial summary judgment de novo. Weyerhaeuser Co. v. Commercial Union Ins. Co., 142 Wash.2d 654, 665, 15 P.3d 115 (2000).

ANALYSIS
¶ 11 We begin our analysis by emphasizing that the only claim before us is Hale's disability accommodation claim under the WLAD and the only issue raised is separation of powers. There are no claims that the legislation may have contravened other constitutional limits.[3] We do not decide whether or not Hale is in fact disabled.

SEPARATION OF POWERS
¶ 12 "The brilliance of our constitution is in its multiplicity of checks and balances." State v. Evans, 154 Wash.2d 438, 445, 114 P.3d 627 (2005). "At least 26 distinct provisions of the federal constitution are founded on the separation of powers principle." In re Juvenile Dir., 87 Wash.2d 232, 238, 552 P.2d 163 (1976). That the United States Constitution has endured since drafted in 1787 is a testament to the fact that its creators understood both the need for a stronger national government and mistrusted power. The Constitution replaced the Articles of Confederation that had presided over an impotent government and was more of a compact among states than a charter for a governing body. DAVID O. STEWART, THE SUMMER OF 1787: THE MEN WHO INVENTED THE CONSTITUTION 24 (2007). At the time of the constitutional convention some individual states had begun to issue their own currencies, appoint ambassadors, and enter into treaties with foreign nations. Id. at 18-21. Nine states claimed to have their own navies. Id. at 22. States mistrusted one another, New Englanders mistrusted Southerners, slave owners mistrusted nonslave owners. Id. at 18-19. The delegates who met in Philadelphia in 1787 to draft a constitution sought to remedy these problems by creating a strong national government while avoiding the danger of tyranny. Those delegates were revolutionaries who had overthrown one tyrannical government and did not intend to create another.
¶ 13 In response to this desire for a stronger yet limited national government, the delegates adopted a plan based largely on the concept of separation of powers. They hoped to ensure liberty by defusing and limiting power. Separation of powers created a clear division of functions among each branch *1026 of government, and the power to interfere with the exercise of another's functions was very limited. In re Juvenile Dir., 87 Wash.2d at 238, 552 P.2d 163; see also Carrick v. Locke, 125 Wash.2d 129, 134-35, 882 P.2d 173 (1994). The doctrine recognizes that each branch of government has its own appropriate sphere of activity. Philip A. Talmadge, Understanding the Limits of Power: Judicial Restraint in General Jurisdiction Court Systems, 22 SEATTLE U.L.REV. 695 (1999). It ensures that the fundamental functions of each branch remain inviolate. Carrick, 125 Wash.2d at 135, 882 P.2d 173. However, separation of powers "does not depend on the branches of government being hermetically sealed off from one another." Id. It recognizes that the separate branches must remain partially intertwined in order to "maintain an effective system of checks and balances, as well as an effective government." Id.
¶ 14 Within this framework the fundamental function of the judicial branch is judicial review. This includes the authority to interpret the law. Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). Judicial review was also familiar to the delegates who convened in 1787. Even before the constitutional convention judges in some states "`had actually set aside laws as being against the [State] Constitution.'" PETER IRONS, A PEOPLE'S HISTORY OF THE SUPREME COURT 45 (1999) (quoting Elbridge Gerry). The debate on judicial review at the convention centered around whether federal law was supreme and whether federal judges could strike down state law. Id. at 44. Elbridge Gerry of Massachusetts, a professed opponent of the "`excesses'" of democracy, was a proponent of judicial review. Id. at 45. "Gerry insisted that judges should be independent of the other branches of government in `their exposition of the laws, which involved a power of deciding on their constitutionality.'" Id. On the other hand, one of the strongest opponents of judicial review was John Mercer of Maryland who spoke in opposition to James Madison's proposed "Council of Revision" and disapproved of the notion that judges, as expositors of the Constitution, should have the authority to declare laws void. Id. at 44. He believed laws ought to be "`well and cautiously made, and then to be uncontrollable.'"[4]Id. William Johnson of Connecticut offered an amendment to give the court jurisdiction over "`all cases arising under this Constitution and laws.'" Id. It was a sweeping enlargement of the Court's powers from Madison's Virginia plan which would have given the national legislature a "negative" over state laws. Johnson's amendment passed with little debate. Id. Thus, the Court's power of review was extended to the states under the "supreme law of the land" provision. "`Should the executive veto be insufficient to restrain the legislature then the courts would be able to declare unconstitutional acts void.'" In re Juvenile Dir., 87 Wash.2d at 241, 552 P.2d 163 (quoting M.J.C. Vile, Constitutionalism and the Separation of Powers 158 (1967)).
¶ 15 The principle of separation of powers was incorporated into the Washington State Constitution in 1889. Consistent with the federal courts we have long held that "`"[i]t is emphatically the province and duty of the judicial department to say what the law is."'" Id. (quoting Marbury, 5 U.S. (1 Cranch) at 177 (quoting United States v. Nixon, 418 U.S. 683, 703, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974))). We have also said that "[i]t is a fundamental rule of statutory construction that once a statute has been construed by the highest court of the State, that construction operates as if it were originally written into it." Johnson v. Morris, 87 Wash.2d 922, 927, 557 P.2d 1299 (1976). In other words, it is within this court's "appropriate sphere of activity" to determine what a particular statute means, and that determination relates back to the time of the statute's enactment.
¶ 16 The doctrine of separation of powers is reciprocal. "Unlike many other constitutional violations, which directly damage rights retained by the people, the damage caused by a separation of powers violation *1027 accrues directly to the branch invaded." Carrick, 125 Wash.2d at 136, 882 P.2d 173. The judicial branch violates the doctrine when it assumes "`"tasks that are more properly accomplished by [other] branches."'" Id. (quoting Mistretta v. United States, 488 U.S. 361, 383, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (quoting Morrison v. Olson, 487 U.S. 654, 680-61, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988))). The legislature's role is to set policy and to draft and enact laws. "`"[T]he drafting of a statute is a legislative, not a judicial, function."'" Sedlacek v. Hillis, 145 Wash.2d 379, 390, 36 P.3d 1014 (2001) (quoting State v. Jackson, 137 Wash.2d 712, 725, 976 P.2d 1229 (1999) (quoting State v. Enloe, 47 Wash.App. 165, 170, 734 P.2d 520 (1987))). Both the legislature and the judiciary intrude upon the other's authority cautiously so as not to violate the doctrine of separation of powers.
¶ 17 The separate branches must remain partially intertwined to maintain an effective system of checks and balances. Carrick, 125 Wash.2d at 135, 882 P.2d 173. The art of good government requires cooperation and flexibility among the branches. Each must act with a spirit of interdependence. In re Juvenile Dir., 87 Wash.2d at 243, 552 P.2d 163. Washington State has enjoyed a rich history of cooperation and harmony among its three branches of government. Each branch has given deference to the others and all three have acted interdependently in exercising authority.
¶ 18 With this history in mind, we turn to the question before us: whether the legislature's retroactive amendment of a statute we have already construed violates separation of powers? To answer this question we must determine "`whether the activity of one branch threatens the independence or integrity or invades the prerogatives of another.'" Carrick, 125 Wash.2d at 135, 882 P.2d 173 (quoting Zylstra v. Piva, 85 Wash.2d 743, 750, 539 P.2d 823 (1975)). Respondents argue that the retroactive application of the legislature's statutory definition of "disability" violates separation of powers by allowing the legislature to effectively overrule our decision in McClarty and act as a court of last resort. They claim that RCW 49.60.040(25) may only apply prospectively and that Hale's claim must therefore be governed by the definition we adopted in McClarty.
¶ 19 As respondents correctly note, statutory amendments are generally presumed to be prospective only. In re F.D. Processing, Inc., 119 Wash.2d 452, 460, 832 P.2d 1303 (1992). The retroactive application of laws may violate the ex post facto doctrine, State v. Schmidt, 143 Wash.2d 658, 672-73, 23 P.3d 462 (2001), affect vested rights and violate due process, State v. Varga, 151 Wash.2d 179, 195, 86 P.3d 139 (2004), or affect other judicial functions. There are also many policy reasons that disfavor changing the law retroactively. Retroactive changes in the law alter the status quo and may disturb a party's reasonable reliance on what the law formerly said and may cause manifest injustices. Landgraf v. USI Film Prods., 511 U.S. 244, 265, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). However, where no constitutional prohibition applies, an amendment may act retroactively if the legislature so intended or if it is curative. In re F.D. Processing, 119 Wash.2d at 460, 832 P.2d 1303 (citing Howell v. Spokane & Inland Empire Blood Bank, 114 Wash.2d 42, 47, 785 P.2d 815 (1990)); see also 1000 Va. Ltd. P'ship v. Vertecs Corp., 158 Wash.2d 566, 584, 146 P.3d 423 (2006).
¶ 20 Although the Court of Appeals has addressed the issue directly in In re Personal Restraint of Stewart, 115 Wash.App. 319, 335, 75 P.3d 521 (2003), this court has never specifically decided the question before us. We have hinted that a retroactive legislative amendment that rejects a judicial interpretation would give rise to separation of powers concerns. See In re Det. of Brooks, 145 Wash.2d 275, 285, 36 P.3d 1034 (2001), overruled on other grounds; see also In re F.D. Processing, 119 Wash.2d at 461, 832 P.2d 1303; Johnson, 87 Wash.2d at 926, 557 P.2d 1299. However, with one exception, none of those cases involved express declarations by the legislature that the legislation was to apply retroactively. And in the one case we confronted a clear statement by the legislature that the act was to apply retroactively; we "declined" to reach the issue and decided *1028 the case on other grounds. In re Det. of Brooks, 145 Wash.2d at 286, 36 P.3d 1034.
¶ 21 The parties offer us varied arguments regarding the acceptability of retroactive legislation based upon the character of the legislative amendment. In the absence of a clear declaration by the legislature regarding retroactivity of an amendment, it may be helpful to characterize changes to a statute as "clarifying" or "restorative" or "curative" or "remedial" to assist in determining legislative intent. See Vertecs Corp., 158 Wash.2d at 584, 146 P.3d 423. However, here the legislature was quite clear that S.S.B. 5340 amending RCW 49.60.040 was remedial and retroactive. The amendment was in direct response to our decision in McClarty, which the legislature believed "failed to recognize" that WLAD is independent from the federal ADA of 1990. The legislature has expressed its intent unequivocally, and we find the nature of the amendment unhelpful in analyzing the separation of powers issue.
¶ 22 "[I]t is this court's obligation to determine and carry out the intent of the legislature." City of Redmond v. Arroyo-Murillo, 149 Wash.2d 607, 616, 70 P.3d 947 (2003) (citing State v. Chester, 133 Wash.2d 15, 21, 940 P.2d 1374 (1997)). Determining the collective intent of the legislature is not always an easy task. City of Everett v. Snohomish County, 112 Wash.2d 433, 441, 772 P.2d 992 (1989). This is particularly true when we are called upon to interpret a law that was passed decades ago. Sometimes the legislative body was not as artful as it could have been in choosing the words for the text of the bill it has passed. Occasionally, try as the court may, the legislature is disappointed with the court's interpretation. As recently expressed by a distinguished member of the legislature, sometimes the court must consider legislation passed by the legislature, shake its head and think, "what were they thinking?" And then of course there are times when the legislature reads an opinion of the court and says the same thing.[5]
¶ 23 In passing S.S.B. 5340, the legislature acted wholly within its sphere of authority to make policy, to pass laws, and to amend laws already in effect.[6] As originally passed, the WLAD did not define "disability." In McClarty, this court, in a five to four opinion, interpreted the act and concluded the definition of "disability" in the ADA was more consistent with the intent of the legislature. The legislature thereafter exercised its authority to amend the act and change the definition of "disability" retroactively. The legislature was careful not to reverse our decision in McClarty nor did the legislature interfere with any judicial function. The legislature has not threatened the independence or integrity or invaded the prerogatives of the judicial branch. We hold that the adoption of S.S.B. 5340 did not violate the separation of powers doctrine. Indeed, the court's efforts to express the intent of the legislature in Pulcino and McClarty and the legislative response in S.S.B. 5340 should serve as a model of how two separate and independent *1029 branches of government can work together in harmony and in the spirit of reciprocal deference to the other's important role and function in the art of governing.

CONCLUSION
¶ 24 We hold that the application of S.S.B. 5340 retroactively did not violate the separation of powers doctrine.[7] We reverse and remand to the trial court for further proceedings consistent with this opinion.
WE CONCUR: Chief Justice GERRY L. ALEXANDER and SUSAN OWENS, CHARLES W. JOHNSON, MARY E. FAIRHURST, JAMES M. JOHNSON, RICHARD B. SANDERS, JJ., and PHILIP J. THOMPSON, J. Pro Tem.
BARBARA A. MADSEN, J., concurs in result only.
NOTES
[1] The term "`disability'" was substituted for the word "`handicap'" under the WLAD in 1993. See McClarty, 157 Wash.2d at 225, 137 P.3d 844.
[2] To illustrate the potential reach of the change, the Washington Employment Lawyers Association (WELA) suggests in its amicus brief that conditions such as arthritis, carpel tunnel syndrome, chronic back pain, back and leg injuries, shoulder, arm, and hand injuries, diabetes, hemophilia, and hypertension were recognized as disabilities under the WLAD prior to our decision in McClarty but are not recognized under the ADA definition we adopted. Amicus Curiae Br. of WELA at 7 n. 5.
[3] Examples of constitutional limits on legislative power to enact retroactive legislation includes the ex post facto clause of the state or federal constitutions, the right to contract, and the due process clause. These, and other constitutional safeguards, limit the legislature's ability to enact retroactive statutes, but none of them have been raised here.
[4] Perhaps ironically, neither Gerry nor Mercer signed the Constitution and both opposed its ratification. IRONS, supra, at 45.
[5] See the remarks of State Senator Lisa Brown who spoke at the induction ceremony of Justice Debra Stephens and commented on the relationship between the legislature and the judiciary. Induction and Administration of Oath of Office for Justice Debra Stephens (Wash.Sup.Ct. Jan. 7, 2008), audio recording by TVW, Washington State's Public Affairs Network, available at http://www.tvw.org.
[6] The Court of Appeals, in Stewart, held that the separation of powers doctrine prevented the legislature from amending the Sentencing Reform Act of 1981, chapter 9.94A RCW, (SRA) retroactively so as to overrule the holding in a separate Court of Appeals decision which had previously interpreted the act. Stewart, 115 Wash.App. at 342, 75 P.3d 521. We disagree with the reasoning of the Court of Appeals, but we are mindful of the problems created for the courts by the legislature's constant tinkering with the SRA. This court recently noted that the act had been amended over 181 times since its adoption in 1981. In re Pers. Restraint of LaChapelle, 153 Wash.2d 1, 7, 100 P.3d 805 (2004). Each time an offender is sentenced, the act requires the sentencing judge to calculate an offender score. To calculate an offender score requires the judge to examine the law and statutes in effect at the time each crime was committed. Calculation of offender scores has become a very difficult, complex, and time consuming process made more complex each time the SRA is amended. In addition to due process and ex post facto concerns, this task is made even more difficult when some laws apply prospectively and some retroactively.
[7] We decline to make a determination as to whether Hale was disabled under the amended definition of "disability" on this record.