

This opinion was
filed for record
at 8:00 on 7-11-2019

Susan L. Carlson
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| CERTIFICATION FROM THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT IN | ) ) ) ) | No. 96335-5 |
| CASEY TAYLOR and ANGELINA TAYLOR, husband and wife and the marital community composed thereof, | ) ) ) ) | EN BANC |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | Filed _____ JUL 1 1 2019 |
| BURLINGTON NORTHERN RAILROAD HOLDINGS, INC., a Delaware Corporation licensed to do business in the State of Washington, and BNSF RAILWAY COMPANY, a Delaware Corporation licensed to do business in the State of Washington, | ) ) ) ) ) ) ) ) | |
| Defendants-Appellees. | ) ) | |

FAIRHURST, C.J.—The Washington Law Against Discrimination (WLAD)

generally prohibits employers from discriminating against an employee because the

employee has a disability. RCW 49.60.180. An employee has a disability if they have an "impairment" that "[i]s medically cognizable or diagnosable," "[e]xists as a record or history," or "[i]s perceived to exist whether or not it exists in fact." RCW 49.60.040(7)(a). The United States Court of Appeals for the Ninth Circuit certified the following question to this court: "Under what circumstances, if any, does obesity qualify as an 'impairment' under the [WLAD, RCW] 49.60.040?" Order Certifying Question to Wash. Supreme Ct., *Taylor v. Burlington N. R.R. Holdings, Inc.*, No 16-35205, at 2 (9th Cir. Sept. 17, 2018). We answer that obesity always qualifies as an impairment under the plain language of RCW 49.60.040(7)(c)(i) because it is recognized by the medical community as a "physiological disorder, or condition" that affects multiple body systems listed in the statute. Therefore, if an employer refuses to hire someone because the employer perceives the applicant to have obesity, and the applicant is able to properly perform the job in question, the employer violates this section of the WLAD.[1]

## I. FACTS AND PROCEDURAL HISTORY

In 2007, Casey Taylor received a conditional offer of employment as an electronic technician for BNSF Railway Company (BNSF). The offer was contingent on a physical exam and a medical history questionnaire. The physical

---

[1] If instead, an employee was seeking reasonable accommodations, the employee would have to show that they actually have obesity and that the obesity met the other criteria of RCW 49.60.040(7)(d).

exam found that Taylor "[m]eets minimum physical demands of the essential functions of Electronic Technician." 2 Excerpts of Record (ER) at 287. Taylor self-reported his height as 5 feet 7 inches and his weight as 250 pounds, resulting in a body mass index (BMI) of 39.2. However, a medical exam found that Taylor's height was 5 feet 6 inches and his weight was 256 pounds, resulting in a BMI of 41.3. *Id.* at 290. "A BMI over 40 is considered 'severely' or 'morbidly' obese, and BNSF treats a BMI over 40 as a 'trigger' for further screening in the employment process." *Taylor v. Burlington N. R.R. Holdings, Inc.*, 904 F.3d 846, 848 (9th Cir. 2018). Because Taylor's BMI was over 40, his results were referred to BNSF's chief medical officer, Dr. Michael Jarrard. BNSF told Taylor it was unable to determine whether he was medically qualified for the job "due to significant health and safety risks associated with extreme obesity (Body Mass Index near or above 40) and uncertain status of knees and back." 2 ER at 147. BNSF offered to reconsider if Taylor paid for expensive medical testing, including a sleep study, blood work, and an exercise tolerance test. Taylor believed these tests would cost, at least, a few thousand dollars. At the time, he was unemployed and did not have medical insurance or United States Veteran's Administration benefits. He could not afford the testing. BNSF told Taylor that it was company policy to not hire anyone who had a BMI of over 35 and that if he could not afford the testing his only option was to lose 10 percent of his weight and keep it off for six months.

In 2010, Taylor sued BNSF and Burlington Northern Railroad Holdings Inc.[2] in King County Superior Court, alleging that BNSF violated the WLAD by refusing to hire him because of a perceived disability—obesity. BNSF removed the case to federal court and moved for summary judgment, relying on federal cases interpreting federal law to argue that obesity is not a disability under the WLAD unless it is caused by a separate, underlying physiological disorder. The United States District Court for the Western District of Washington agreed and granted summary judgment on this issue to BNSF, ruling that "under the WLAD, a plaintiff alleging disability discrimination on the basis of obesity must show that his or her obesity is caused by a physiological condition or disorder or that the defendant perceived the plaintiff's obesity as having such a cause." 1 ER at 23. The court dismissed the case with prejudice.

Taylor timely appealed to the Ninth Circuit. That court concluded that whether obesity may constitute an impairment, and thus a disability, under the WLAD is an unresolved issue of state law and certified the question to this court. *Taylor*, 904 F.3d at 849. We accepted certification.

## II. ANALYSIS

We hold that obesity is always an impairment under the plain language of RCW 49.60.040(7)(c)(i) because the medical evidence shows that it is a

---

[2] We refer to both the railway company and the holding company collectively as "BNSF."

"physiological disorder, or condition" that affects many of the listed body systems. Obesity does not have to be caused by a separate physiological disorder or condition because obesity itself is a physiological disorder or condition under the statute. Our legislature has made it clear that the WLAD is broader than its federal counterpart, the Americans with Disabilities Act of 1990 (ADA),[3] and we decline to use federal interpretations of the ADA to constrain the protections offered by the WLAD.

A.    Standard of review

The certified question asks us to determine whether obesity can qualify as an impairment under RCW 49.60.040. Statutory interpretation "is a question of law reviewed de novo." *State v. James-Buhl*, 190 Wn.2d 470, 474, 415 P.3d 234 (2018). "Statutory interpretation begins with the statute's plain meaning." *Id.* "Plain meaning is 'discerned from the ordinary meaning of the language at issue, the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole.'" *Id.* (quoting *State v. Engel*, 166 Wn.2d 572, 578, 210 P.3d 1007 (2009)). If the statute is ambiguous, the court resorts "to principles of statutory construction, legislative history, and relevant case law to assist [the court] in discerning legislative intent." *Cockle v. Dep't of Labor & Indus.*, 142 Wn.2d 801, 808, 16 P.3d 583 (2001).

---

[3] 42 U.S.C. § 12102.

5

B.    Obesity is an impairment under the WLAD

1.    The statute

As this is a question of statutory interpretation, we look first to the text of our statute. The WLAD makes it "an unfair practice for any employer . . . [t]o refuse to hire any person because of . . . the presence of any sensory, mental, or physical disability . . . unless based upon a bona fide occupational qualification." RCW 49.60.180(1). The statute provides that it is not discrimination to refuse to hire a person whose disability "prevents the proper performance of the particular worker involved." *Id.* "Disability" is defined as "a sensory, mental, or physical impairment that: (i) [i]s medically cognizable or diagnosable; or (ii) [e]xists as a record or history; or (iii) [i]s perceived to exist whether or not it exists in fact." RCW 49.60.040(7)(a). A disability can be "temporary or permanent, common or uncommon, mitigated or unmitigated" and can exist regardless of whether it limits the ability to work generally or at a particular job, or limits any other activity in this chapter. RCW 49.60.040(7)(b).

"Impairment" includes, but is not limited to:

> (i) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: Neurological, musculoskeletal, special sense organs, respiratory, including speech organs, cardiovascular, reproductive, digestive, genitor-urinary, hemic and lymphatic, skin, and endocrine; or

> (ii) Any mental, developmental, traumatic, or psychological disorder, including but not limited to cognitive limitation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

RCW 49.60.040(7)(c). The parties in this case debate whether obesity is a "physiological disorder, or condition" under this definition.

2. The history of the statute and its interpretation

This is not the first time that we have been asked to interpret this statute, and the history of this statute provides insight into our legislature's intent in adopting it. The original version of the WLAD did not define the term "disability." *See Hale v. Wellpinit Sch. Dist. No. 49*, 165 Wn.2d 494, 500, 198 P.3d 1021 (2009). Instead, the WLAD created an agency, now known as the Washington State Human Rights Commission (HRC), to administer the law. The HRC is charged with formulating policies and adopting rules to effectuate the WLAD. RCW 49.60.110, .120(3). The HRC has explained that "a person will be considered to be disabled by a sensory, mental, or physical condition if he or she is discriminated against because of the condition and the condition is abnormal." WAC 162-22-020(2)(c).

In 2000, this court wrestled with how to apply HRC's definition in reasonable accommodation cases. *Pulcino v. Fed. Express Corp.*, 141 Wn.2d 629, 641, 9 P.3d 787 (2000). When a plaintiff makes a disparate treatment claim, the plaintiff need not show that they are actually suffering from an impairment. Instead, it is enough to show that the employer discriminated against the plaintiff because it perceived the

7

plaintiff to be suffering from an impairment. RCW 49.60.040(7)(a)(iii). But in a reasonable accommodation case, the employee must show that they are actually suffering from an impairment and that the employer failed to reasonably accommodate them. RCW 49.60.040(7)(d). In *Pulcino*, we concluded that the HRC definition was unworkable in reasonable accommodation claims because it would require an employee to show that "the employer failed to accommodate the employee (i.e., discriminated against him or her) *because of* the employee's abnormal condition. This implies that the employer accommodates other employees; but, obviously, employees who are not disabled do not require such accommodation." 141 Wn.2d at 641. Therefore, we adopted a different test, holding that in a reasonable accommodation case, the employee can prove that they are actually disabled if "(1) [they have]/had a sensory, mental, or physical abnormality and (2) such abnormality has/had a substantially limiting effect upon the individual's ability to perform his or her job." *Id.* We explained that "[a]n employee can show that [they have] a sensory, mental or physical abnormality, by showing that [they have] a condition that is medically cognizable or diagnosable, or exists as a record or history." *Id.* (citing former WAC 162-22-020(2) (1999)). We also expressly recognized that the WLAD's definition of "disability" is broader than the definition in the ADA. *Id.* at 641 n.3.

Six years later, this court rejected the HRC's definition of "disability" altogether and instead held that the ADA's definition applies to all disability discrimination actions brought under the WLAD. *McClarty v. Totem Elec.*, 157 Wn.2d 214, 228, 137 P.3d 844 (2006). We explained that the HRC's definition was confusing and that although courts often defer to administrative agencies' interpretations of the statutes they are charged with administering, the HRC's definition was "not a rational and sensible interpretation of the term 'disability.'" *Id.* We rejected that definition "in favor of a definition better supported by the WLAD's text, the legislature's intent, and our jurisprudence"—the definition found in the ADA. *Id.* We held that as under the ADA, "a plaintiff bringing suit under the WLAD establishes that he has a disability if he (1) has a physical or mental impairment that substantially limits one or more of his major life activities, (2) has a record of such an impairment, or (3) is regarded as having such an impairment." *Id.* We noted that if we adopted the federal definition, we could look to the "abundance of authority interpreting the ADA" to "assist us in construing and applying similar provisions in the WLAD." *Id.* at 229 n.10.

Justice Owens dissented, explaining that the legislature had known since 1990 that the WLAD's definition of "disability" was broader than the ADA's definition and had never chosen to amend the WLAD to overrule the HRC's interpretation. *See id.* at 244 (Owens, J., dissenting) (citing *Wash. Indep. Tel. Ass'n v. Wash. Utils. &*

*Transp. Comm'n*, 148 Wn.2d 887, 905, 64 P.3d 606 (2003) (holding that the legislature is deemed to have acquiesced in a statutory interpretation when it makes no change for a substantial period of time after the interpretation has been issued)). She criticized the decision to overrule the HRC's policy choice to define "disability" broadly and explained that the key focus in achieving the public policy of the WLAD is "'whether the worker has any "sensory, mental or physical" condition which the employer uses as a basis for rejecting him (or her) even though that individual may be perfectly capable of properly performing the work.'" *Id.* at 246 (Owens, J., dissenting) (emphasis omitted) (quoting Br. of Appellant at 24-25, 44-45, *Chi., Milwaukee, St. Paul & Pac. R.R. v. Wash. State Human Rights Comm'n*, No. 44105 (Wash.)).

The legislature disagreed with the definition adopted by the majority in *McClarty*. It expressly found "that the supreme court, in its opinion in *McClarty v. Totem Electric*, failed to recognize that the Law Against Discrimination affords to state residents protections that are wholly independent of those afforded by the [ADA], and that the law against discrimination has provided such protections for many years prior to passage of the federal act." LAWS of 2007, ch. 317, § 1 (citation omitted). The legislature chose to define "disability" broadly as "the presence of a sensory, mental, or physical impairment," even if it does not limit life activities, and explained that an "'impairment' includes, but is not limited to . . . [a]ny physiological

disorder, or condition . . . affecting one or more of the [listed] body systems." RCW 49.60.040(7)(a), (c)(i).

The above history provides two crucial insights into legislative intent. First, the legislature intended to adopt a broad and expansive definition of "disability" in order to protect against discrimination. Second, the legislature has expressly rejected the idea that the ADA should be used to constrain the protections offered under the WLAD.

3.     Obesity is an impairment under the plain language of the WLAD

In order to prevail in a disparate treatment case like this one, a plaintiff need show only that the employer perceived the employee as having an "impairment."[4] RCW 49.60.040(7); *cf. McClarty*, 157 Wn.2d at 248 (Owens, J., dissenting) (explaining that requiring only this showing makes sense because "'an employee claiming disparate treatment is not asking the employer to take any remedial steps on his behalf. Rather, the employee asks only that the employer not terminate him for discriminatory reasons'" (quoting *McClarty v. Totem Elec.*, 119 Wn. App. 453,

---

[4] Unlike in a reasonable accommodation case, the plaintiff in a disparate treatment case need not show that they are actually impaired or that the impairment has any actual or potential substantially limiting effect. *See* RCW 49.60.040(7)(d). In a reasonable accommodation case, the plaintiff would have to show that they actually had obesity and that their obesity had "a substantially limiting effect upon the individual's ability to perform his or her job, the individual's ability to apply or be considered for a job, or the individual's access to equal benefits, privileges, or terms or conditions of employment" or that the plaintiff had "put the employer on notice of the existence of an impairment, and medical documentation . . . establish[ed] a reasonable likelihood that engaging in job functions without an accommodation would aggravate the impairment to the extent that it would create a substantially limiting effect." *Id.*

470, 81 P.3d 901 (2003), *rev'd*, 157 Wn.2d 214)). We are expressly instructed to construe the WLAD "liberally for the accomplishment of the purposes thereof." RCW 49.60.020.

As explained above, a "disability" under the WLAD is defined as "a sensory, mental, or physical impairment that: (i) [i]s medically cognizable or diagnosable; or (ii) [e]xists as a record or history; or (iii) [i]s perceived to exist whether or not it exists in fact." RCW 49.60.040(7)(a). Because there is no question here that BNSF perceived Taylor as having "extreme obesity," 2 ER at 147, the issue presented by this disparate treatment case is whether obesity can qualify as an impairment.[5] It can. Obesity is not merely the status of being overweight. Obesity is recognized by the medical community as a primary disease. The medical evidence shows that obesity is always an impairment because it is a "physiological disorder, or condition . . . affecting one or more of the [listed] body systems." RCW 49.60.040(7)(c)(i).

(a) Obesity is a physiological disorder, or condition

First, the medical evidence shows that obesity is a "physiological disorder, or condition" under RCW 49.60.040(7)(c)(i).

---

[5] The dissent would reframe the question to ask when obesity is a disability under the WLAD, but the parties in this case do not dispute that BNSF perceived Taylor to have obesity. The only question before us is whether obesity can qualify as an impairment under RCW 49.60.040(7)(c)(i).

"Physiological" is not defined by the statute, but *Webster's* defines "physiology" as "the organic processes and phenomena of an organism or any of its parts or of a particular bodily process." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1707 (2002). Even if a condition must be physiological to be an impairment, a contention that is disputed in this case, obesity would qualify because it involves both the organic process and phenomena of an organism—the excessive accumulation of fat cells.

Obesity is not only physiological; it is also recognized as a disorder. *The Merck Manual of Diagnosis and Therapy* lists "obesity" under section 1, "Nutritional Disorders." THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 19 (Robert S. Porter et al. eds., 20th ed. 2018) (hereinafter MERCK MANUAL).[6] According to the most recent edition of the *Merck Manual*, obesity may be diagnosed initially based on BMI, but doctors may also consider waist circumference and body composition analysis. *Id.* at 20-21. The fact that obesity is often diagnosed merely by measuring weight does not mean that it is not a physiological disorder affecting body systems, just as the fact that diabetes is diagnosed merely by "measuring plasma glucose" does not mean that it is not a physiological disorder affecting body systems. *Id.* at 1253 (boldface omitted). Just as type 2 diabetes is a disorder involving

---

[6] The *Merck Manual* is a "reliable and trusted source for medical information." Krystal Bullers, *Merck Manuals*, 104 J. MED. LIBR. ASS'N 369, 371 (2016); *see also State v. Cissne*, 72 Wn. App. 677, 681, 865 P.2d 564 (1994) (citing the *Merck Manual*).

an abnormal response to insulin that results in above average blood sugar numbers, obesity is a disorder involving an abnormal accumulation of fat cells that results in above average weight. Not all people who are over a certain weight to height ratio have obesity.

Although obesity is ultimately the result of "a long-standing imbalance between energy intake and energy expenditure," the medical community has recognized that the "[c]auses of obesity are probably multifactorial and include genetic predisposition." *Id.* at 19. A predisposition toward obesity can be caused by "endocrine disruptors (eg [sic], bisphenol A [BPA]), gut microbiome, sleep/wake cycles, and environmental factors." *Id.* There can sometimes be underlying physiological disorders that contribute to obesity, such as tumors, Cushing syndrome, hypothyroidism, or eating disorders, but obesity may also occur in people without these other disorders. Genetic factors, prenatal maternal obesity or smoking, and intrauterine growth restriction can all contribute to the development of obesity. *Id.* at 20. "Heritability of BMI is about 66 [percent]." *Id.* at 19.

There is an overwhelming consensus in the medical community that obesity is a disease in and of itself. *See* Amici Curiae Br. of Obesity Action Coal. (OAC) & Disability Rights Wash. (DRW) in Supp. of Appellants at 7-13. The American Association of Clinical Endocrinologists (AACE) published a position statement on obesity in 2012 "strongly assert[ing] that obesity is a primary disease." Jeffrey I.

Mechanick et al., *American Association of Clinical Endocrinologists' Position Statement on Obesity and Obesity Medicine*, 18 ENDOCRINE PRAC. 642, 644 (2012) (hereinafter *AACE Position Statement*). The AACE rejected the argument that obesity is merely "a quantitative excess of body fat," explaining instead that "obesity is an altered *physiological* and metabolic state, with environmental, genetic, and hormonal determinants, which results in increased morbidity and mortality." *Id.* (emphasis added). The American Society of Metabolic and Bariatric Surgery agrees, stating that obesity is "a multifactorial disease with a strong genetic component" and that a number of "hormonal, metabolic, psychological, cultural and behavioral factors . . . promote fat accumulation and weight gain." Disease of Obesity, AM. SOC'Y FOR METABOLIC & BARIATRIC SURGERY, https://asmbs.org/patients/disease-of-obesity [https://perma.cc/2KPT-3NTU].

In 2013, the American Medical Association (AMA) also recognized obesity as a disease. AMA Resolution 420, A-13 (May 16, 2013) (hereinafter AMA Resolution). The AMA has specific criteria for labeling something a disease—"1) an impairment of the normal functioning of some aspect of the body; 2) characteristic signs or symptoms; and 3) harm or morbidity." *Id.* The AMA found that "there is now an overabundance of clinical evidence to identify obesity as a multi-metabolic and hormonal disease state including impaired functioning of appetite dysregulation, abnormal energy balance[], endocrine dysfunction including elevated leptin levels

and insulin resistance, infertility, dysregulated adipokine signaling, abnormal endothelial function and blood pressure elevation, nonalcoholic fatty liver disease, dyslipidemia, and systemic and adipose tissue inflammation." *Id.* The resolution further explained that "[o]besity has characteristic signs and symptoms including the increase in body fat and symptoms pertaining to the accumulation of body fat, such as joint pain, immobility, sleep apnea, and low self-esteem." *Id.* This resolution was introduced by the AACE, the American College of Cardiology, the Endocrine Society, the American Society for Reproductive Medicine, the Society for Cardiovascular Angiography and Interventions, the American Urological Association, and the American College of Surgeons. *Id.* The AMA noted that the World Health Organization, the United States Food and Drug Administration, the National Institutes of Health, the Internal Revenue Service, and one of the largest health insurance companies, CIGNA, all recognize obesity as a disease. *Id.* The AMA explained that although obesity can be caused by life choices, it is still a disease, just as lung cancer is still a disease even though it can be caused by the choice to smoke cigarettes. *Id.* Moreover, even if obese patients successfully lose weight, "hormonal and metabolic abnormalities" can remain. *Id.*

The recognition of obesity as a disease further supports our finding that obesity is a physiological disorder under the statute. The WLAD does not define "disorder" but *Webster*'s defines "disorder" as "a derangement of function" and "an

abnormal physical or mental condition." WEBSTER'S, *supra*, at 652. A disease is commonly understood to fit within this definition. *See* AMA Resolution, *supra* (describing obesity as a disease involving "dysregulation" and "dysfunction" of various body systems and "abnormal" functioning of the body). Therefore, obesity is a physiological disorder under the WLAD.

Obesity is also a qualifying condition. The legislature also did not provide a definition of "condition," but the HRC did. According to WAC 162-22-020(2)(c), "[a] condition is a 'sensory, mental, or physical disability' if it is an abnormality and is a reason why the person having the condition did not get or keep the job in question." Stated another way, "for enforcement purposes, a person will be considered to be disabled by a sensory, mental, or physical condition if he or she is discriminated against because of the condition and the condition is abnormal." *Id.*[7] It is undisputed that Taylor did not get or keep the job in question because BNSF perceived him as obese.

The definition promulgated by the HRC is "entitled to be given great weight as it is the construction of the statute by the administrative body whose duty it is to administer its terms. *Phillips v. City of Seattle*, 111 Wn.2d 903, 908, 766 P.2d 1099

---

[7] We decided that this definition was unworkable in reasonable accommodation cases, *Pulcino*, 141 Wn.2d at 641, and dismissed it entirely in *McClarty*, 157 Wn.2d at 228. However, the legislature rejected the *McClarty* decision's new definition and neither the legislature nor the HRC defined "condition" differently for disparate treatment cases despite knowing this history.

(1989). "A court must give great weight to the statute's interpretation by the agency which is charged with its administration, absent a compelling indication that such interpretation conflicts with the legislative intent." *Marquis v. City of Spokane*, 130 Wn.2d 97, 111, 922 P.2d 43 (1996); *see also McClarty*, 157 Wn.2d at 237-38 (Owens, J., dissenting). The legislature could have defined the word "condition" differently when it revised the WLAD in 2007, but it chose not to.

The Court of Appeals has also adopted a broad definition of the word "condition" in this context. *See Clipse v. Commercial Driver Servs., Inc.*, 189 Wn. App. 776, 358 P.3d 464 (2015), *review denied*, 185 Wn.2d 1017 (2016). The *Clipse* court was faced with the question of whether the side effects of methadone qualified as a disability under the WLAD. The court reviewed the statutory definition of "disability," applied the legislative mandate to "construe the statute liberally to effectuate its purpose of remedying disability discrimination," and concluded that "under the plain language of the statute, any mental or physical condition may be a disability." *Id.* at 793. The *Clipse* court explained that Clipse had presented evidence of a physical condition because he showed "that taking methadone had impairing physical side effects," and the court upheld the jury verdict in his favor. *Id.* BNSF attempts to distinguish *Clipse* as relying on Clipse's drug addiction. But the court did not hold that he was disabled because he was a drug addict. The court held that

he was disabled because his use of methadone was a condition that "had impairing physical side effects." *Id.*

BNSF argues that "[w]eight is not 'an abnormality'" because weight is intrinsic to human bodies and is not immutable. Br. of Appellees on Certified Question at 26-27. However, Taylor correctly points out that the question before us is not whether *weight* is a condition under the WLAD, but whether *obesity* is. BNSF did not just perceive Taylor as over a certain weight. Instead, it was concerned that his perceived "extreme obesity" posed significant health and safety risks. 2 ER at 147. As discussed above, obesity is a medical condition that not all humans have. *See also AACE Position Statement*, *supra*, at 644 (explaining that obesity is a disease and is also commonly referred to as a "'condition'")

Amici National Association of Manufacturers (NAM) et al. make a similar argument, stating that obesity is not an "abnormality" because a large percentage of the population is overweight or obese according to BMI. *See* Br. of Amici Curiae NAM et al. at 6 (explaining that in 2016, 29 percent of adult Washingtonians were obese according to BMI). However, even if all of these individuals were actually suffering from obesity, the WLAD tells us that a disability may be "temporary or permanent, common or uncommon." RCW 49.60.040(7)(b). Therefore, "abnormal" must refer to something other than statistical frequency and cannot be limited to immutable states of being.

Although the word "abnormal" is not defined by the HRC, the medical evidence shows that obesity is an abnormal condition. The AMA explains that obesity is a "disease state including . . . *abnormal* energy balance[]" and "*abnormal* endothelial function" and results in "metabolic *abnormalities*" even after weight loss. AMA Resolution, *supra* (emphasis added). Therefore, obesity is a condition within the meaning of WAC 162-22-020(2) because it is an abnormality and BNSF's perception that Taylor was obese was undisputedly the reason that Taylor did not get or keep the job in question.

Therefore, obesity is a "physiological disorder, or condition" under RCW 49.60.040(7)(c)(ii).

(b) Obesity affects several of the statutorily listed body systems

Second, the medical evidence shows that obesity is not merely associated with other health problems but, instead, that obesity itself inherently affects one or more of the body systems listed in RCW 49.60.040(7)(c)(i). These body systems are "[n]eurological, musculoskeletal, special sense organs, respiratory, including speech organs, cardiovascular, reproductive, digestive, genitor-urinary, hemic and lymphatic, skin, and endocrine." RCW 49.60.040(7)(c)(i). Amici OAC and DRW describe in detail how obesity itself affects the cardiovascular or circulatory systems, the musculoskeletal system, the lymphatic system, and the endocrine system:

1.   Obesity affects the "cardiovascular" or "circulatory" system. Increased adipose tissue has a direct impact on heart structure

20

and function because it releases proteins that cause heart inflammation; increases total blood volume and enlarges portions of the heart; and deposits fat directly onto the heart, causing it increased strain.

2. Obesity also impacts the "musculoskeletal" system as the mass inherently associated with increased body fat places increased stress on the joints – in particular, the weight born by the knees – which causes cartilage degradation and leads to osteoarthritis.

3. Obesity affects the "lymphatic" system. Studies show that increased adipose tissue impairs the flow of lymphatic fluid by compressing and damaging lymphatic vessels and thus leading to lymphedema.

4. Obesity also affects the "endocrine" system because adipose tissue secretes hormones that regulate metabolism, contributing to insulin resistance and ultimately diabetes.

Br. of OAC & DRW at 18-19 (footnotes omitted) (citing published medical studies); *see also id.* at 3-5 (explaining other physical effects of obesity and citing studies). The AMA expressly found that obesity impairs normal functioning of the body. AMA Resolution, *supra*. In addition, complications of obesity include many other medical problems, such as diabetes, sleep apnea, osteoarthritis, infertility, cancer, skin disorders, and intertriginous infections. MERCK MANUAL, *supra*, at 20. Because obesity is recognized by the medical community as a physiological disorder, or condition, and it affects the normal functions of several of the listed body systems,

it will always meet the WLAD's statutory definition of "impairment." *See* RCW

49.60.040(7)(c).[8]

(c) BNSF's and amici's counterarguments are not persuasive

Amici NAM et al. argue that we should not recognize obesity as an

impairment because it will have a stigmatizing effect on obese individuals. *See* Br.

of Amici Curiae NAM et al. at 13-15. However, in this case, BNSF told Taylor that

it would not hire him because it perceived him as having "extreme obesity," and he

could not afford supplemental medical testing. 2 ER at 147. It is difficult to see how

protection under the WLAD will produce more psychological harm than is caused

by companies freely and openly refusing to hire people because of their obesity. The

*Merck Manual* recognizes that "[o]besity leads to social, economic, and psychologic

problems as a result of prejudice, discrimination, poor body image, and low self-

esteem. For example, people may be underemployed or unemployed." MERCK

MANUAL, *supra*, at 20. We construe the definition of "impairment" in order to

effectuate the purposes of the WLAD—remedying and preventing this kind of

discrimination. *See Kumar v. Gate Gourmet, Inc.*, 180 Wn.2d 481, 500, 325 P.3d

193 (2014) ("Washington courts construe the WLAD's protections broadly."); RCW

---

[8] The dissent's suggestion that a person can have obesity without it affecting any of the listed body systems is inconsistent with the medical science. Because obesity always affects systems of the body, a person who had a high BMI but whose body systems were not affected would not have obesity and therefore would not be covered by this opinion.

49.60.020 (instructing courts to construe the WLAD "liberally for the accomplishment of the purposes thereof"); *see also* RCW 49.60.040 (using the broad and illustrative language of "includes, but is not limited to" to define what qualifies as an impairment under the WLAD).

BNSF also relies on the HRC's published "Frequently Asked Questions and Answers" to argue that obesity is not a disability. *See* WASH. STATE HUMAN RIGHTS COMM'N, GUIDE TO DISABILITY AND WASHINGTON STATE NONDISCRIMINATION LAWS: FREQUENTLY ASKED QUESTIONS AND ANSWERS (2012). According to the HRC:

> In Washington State, the Legislature has enacted a broad definition of disability that increases protections for persons with medical, psychological, and other impairments. The Washington definition is different than the definition found in the Americans with Disabilities Act . . .–it is broader, covers more medical conditions, and is not restricted to a condition that substantially limits a major life activity.

*Id.* at 2. However, this guide also explains that "[p]hysical traits such as being left handed or being short are not disabilities. (Though there are medical and genetic conditions that cause extreme short stature that are disabilities.)" *Id.* at 4. BNSF argues that because weight is a physical trait, it is not a disability under the WLAD. According to BNSF, "Nobody is described as 'suffering from' their . . . weight." Br. of Appellees on Certified Question at 7. Again, BNSF confuses the question before

us, conflating "weight" with "obesity."[9] People are described as suffering from obesity. *See, e.g., Martini v. Boeing Co.*, 88 Wn. App. 442, 446, 945 P.2d 248 (1997) (mentioning that the plaintiff had been diagnosed as "suffering from chronic depression, heart disease, and *obesity*" in a disability discrimination case (emphasis added)), *aff'd*, 137 Wn. 2d 357, 971 P.2d 45 (1999). Obesity is not a physical trait. It is a disease. *See supra* Section II.B.3(a); *see also Equal Emp't Opportunity Comm'n v. Res. for Human Dev., Inc.*, 827 F. Supp. 2d 688, 691 (E.D. La. 2011) (noting that on the plaintiff's "death certificate, the official cause of death listed was 'morbid obesity'"); MERCK MANUAL, *supra*, at 19 ("[O]besity and its complications cause as many as 300,000 premature deaths each year.").

The evidence presented to us shows that obesity is always an impairment under the WLAD because it is a "physiological disorder, or condition . . . affecting one or more of the [listed] body systems." *See* RCW 49.60.040(7)(c)(i). BNSF argues that we should follow the rulings of some federal courts interpreting the ADA and hold that obesity can be a disability only if it is caused by a separate, underlying physiological disorder. We decline to do so. The WLAD is broader than the ADA and offers its own independent protections to Washingtonians.

---

[9] Merely being overweight is not an impairment under the WLAD, but obesity is. Therefore, plaintiffs making disability discrimination claims must show that their obesity "[i]s medically cognizable or diagnosable," "[e]xists as a record or history," or "[i]s perceived to exist whether or not it exists in fact." RCW 49.60.040(7)(a). In reasonable accommodation cases, plaintiffs must show that they actually have obesity. RCW 49.60.040(7)(d).

## III. CONCLUSION

We answer the certified question as follows—obesity always qualifies as an impairment under the plain language of RCW 49.60.040(7)(c)(i) because it is a "physiological disorder, or condition" that affects many of the listed body systems. Plaintiffs making a disparate treatment claim under the WLAD need not show that they actually had an impairment, e.g., that they actually were suffering from obesity. They need show only that their actual or potential employers perceived them to have a statutory impairment. RCW 49.60.040(7)(a)(iii). Because obesity qualifies as an impairment under the plain language of our statute, it is illegal for employers in Washington to refuse to hire qualified potential employees because the employer perceives them to be obese. *See* RCW 49.60.180.

*Taylor v. Burlington N. R.R. Holdings, Inc.*, No. 96335-5

Fairhurst, C.J.

WE CONCUR:

Johnson, J.

Wiggins, J.

Madsen, J.

Gonzalez, J.

Owens, J.

Stephens, J.

No. 96335-5

YU, J. (dissenting) — I agree with the majority that obesity does not have to be caused by a separate physiological disorder or condition to qualify as an impairment pursuant to the RCW 49.60.040(7)(c)(i). Majority at 5. I also agree that obesity, as a physiological disorder or condition, is distinct from weight, which is a physical trait. *See id.* at 23-24. And the majority is correct that "[o]besity is not merely the status of being overweight," *id.* at 12, and that there is growing consensus in the medical community that obesity is itself a disease, *id.* at 14. But because the diagnostic line between "overweight" and "obese" is a function of an individual's weight in relationship to their height, I do not agree that "obesity always qualifies as an impairment under the plain language of the RCW 49.60.040(7)(c)(i) ." *Id.* at 2.

I would reframe the certified question slightly to ask under what circumstances, if any, obesity is a disability for purposes of the Washington Law Against Discrimination (WLAD), ch. 49.60 RCW. According to the plain

1

language of the statute, obesity is a disability if (i) the plaintiff's obesity is medically cognizable, medically diagnosable, exists as a record or history, or is perceived to exist whether or not it actually does, RCW 49.60.040(7)(a), and (ii) the plaintiff's obesity impairs one or more body systems listed in RCW 49.60.040(7)(c)(i). This approach avoids a *per se* rule that could extend WLAD protections to individuals who are not disabled and avoids the stigma of labeling all individuals over a certain height to weight ratio as impaired.

A. Defining obesity

The majority states that obesity involves "an abnormal accumulation of fat cells." *Id.* at 14. But, as the majority explains, obesity as a disease is more than "'a quantitative excess of body fat.'" *Id.* at 15 (quoting Jeffrey I. Mechanick et al., *American Association of Clinical Endocrinologists' Position Statement on Obesity and Obesity Medicine*, 18 ENDOCRINE PRAC. 642, 644 (2012)). Instead, "'obesity is an altered physiological and metabolic state, with environmental, genetic, and hormonal determinants, which results in increased morbidity and mortality.'" *Id.* (emphasis omitted) (quoting Mechanick et al., *supra*, at 644). This begs the question: At what point does an excess of body fat make an individual "obese"?[1]

---

[1] The parties and amici have cited to dozens of scientific journals and scholarly articles to aid our understanding of obesity and its effects on the body. One thing is clear from the literature—there is disagreement in the medical community on how to measure obesity and what effects it has on the various systems of the body. Courts can evaluate impairment from obesity

2

"The National Institutes of Health and the World Health Organization have both adopted BMI [body mass index] as a criterion for defining obesity." George A. Bray et al., *The Science of Obesity Management: An Endocrine Society Scientific Statement*, 39 ENDOCRINE REVS. 79, 81 (2018); *see also* THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 19 (Robert S. Porter et al. eds., 20th ed. 2018) ("Obesity is excess body weight, defined as a body mass index [greater than or equal to 30]."). BMI is considered a useful population-level measure of obesity but has been questioned by some experts as inadequate for diagnosis of individuals. *See, e.g.*, NAT'L HEART, LUNG & BLOOD INST., U.S. DEP'T OF HEALTH & HUMAN SERVS., MANAGING OVERWEIGHT AND OBESITY IN ADULTS: SYSTEMATIC EVIDENCE REVIEW FROM THE OBESITY EXPERT PANEL 5 (2013) ("BMI correlates fairly well with total body fat on a population basis; however, it has limitations in predicting excess body fat associated with health risk on an individual basis."); Louise J. Aronne et al., *Obesity as a Disease State: A New Paradigm for Diagnosis and Treatment*, 9 CLINICAL CORNERSTONE 9, 13 (2009) ("[I]ndividuals with similar BMIs can have vastly different body compositions."); Mechanick et al., *supra*, at 645 ("BMI . . . neglects the extent to which any increase in adiposity adversely alters physiology, metabolism, and health.").

---

on an individual basis. But the legislature is the proper body to evaluate all of the available information and make a policy decision on whether obesity is a per se impairment and the medical factors that should be considered.

3

BMI does not distinguish weight associated with muscle from weight associated with fat. Bray et al., *supra*, at 82. For example, a professional football player may have a high BMI because of his weight in relation to his height, but that weight is associated with muscle rather than fat.[2] BMI has also been criticized for its inability to distinguish body fat distribution, which is relevant to determining metabolic risk. *Id.*

To be sure, medical practitioners are cautioned to not rely solely on BMI and to look to other factors when diagnosing obesity. But those factors do not have the same type of hard and fast classifications that BMI does and often include looking at the effect on other systems. *See* THE MERCK MANUAL, *supra*, at 20-21.

B. Impairment should be evaluated individually

Whether obesity is defined as BMI over 30, an abnormal excess in fat cells, or some other measure, the WLAD requires a showing that one or more specified body systems is *actually* impaired. RCW 49.60.040(7)(c)(i). In many cases, this requirement will be met by the diagnosis or perception itself.

According to amici, BMI is "only the first step in diagnosing obesity" and "misclassification is somewhat common." Amici Curiae Br. of Obesity Action Coal. & Disability Rights Wash. in Supp. of Appellants at 5. In addition to body

---

[2] *See* Angus Chen, *If BMI Is the Test of Health, Many Pro Athletes Would Flunk*, NPR (Feb. 4, 2016, 12:36 PM), https://www.npr.org/sections/health-shots/2016/02/04/465569465/if-bmi-is-the-test-of-health-many-pro-athletes-would-flunk [https://perma.cc/5F5X-9W2U].

composition, "clinical effects of obesity on health, feeling, and functioning are considered" as part of a complete diagnosis. *Id.* at 6. Thus, a medical diagnosis of obesity may already include a showing that a particular body system is affected. If not, the plaintiff would be required to provide additional evidence to meet the requirements of the WLAD. *See generally* Henry C. Lukaski, *Commentary: Body Mass Index Persists as a Sensible Beginning to Comprehensive Risk Assessment*, 43 INT'L J. EPIDEMIOLOGY 669, 670 (2014) (discussing the "metabolically healthy obese").

In this case, Casey Taylor was diagnosed as extremely obese by BNSF's physician based on his BMI. 2 Excerpts of Record (ER) at 147. His obesity was perceived to affect "other health conditions," including sleep apnea and diabetes. *Id.* at 164. Sleep apnea affects the respiratory system, and diabetes affects the endocrine system. Thus, Taylor's obesity was (a) medically diagnosed or perceived and (b) perceived to affect at least one or more body systems.

C. Implications beyond employment

We typically provide narrow answers to certified questions from federal courts. *See, e.g., Hill v. Xerox Bus. Servs., LLC*, 191 Wn.2d 751, 760, 426 P.3d 703 (2018). The court's broad holding that obesity always qualifies as an impairment under the plain language of the WLAD has potentially far-reaching consequences beyond those considered in this case.

5

As an example, RCW 49.60.215 makes it an unfair practice "to commit an act which directly or indirectly results in any distinction, restriction, or discrimination . . . in any place of public resort, accommodation, assemblage, or amusement" because of the presence of a disability. A place of public accommodation must reasonably accommodate "the known physical, sensory, or mental limitations of a person with a disability." WAC 162-26-080. But unlike reasonable accommodations in the employment context, no showing of actual impairment or substantially limiting effect is required. *See* majority at 11 n.4; *see also* RCW 49.60.040(7)(d). In guidance to operators of places of public accommodation, the Human Rights Commission explains that a "disability may be obvious, such as a person who uses a wheelchair" or that a person "may need to inform you of the disability." WASH. STATE HUMAN RIGHTS COMM'N, GUIDE TO DISABILITY AND WASHINGTON STATE NONDISCRIMINATION LAWS: FREQUENTLY ASKED QUESTIONS AND ANSWERS 13 (2012). An operator making a good faith attempt to comply with the law risks offending some patrons by assuming they are disabled because of their weight or risks opening themselves up to liability to patrons who claim their disability should have been "obvious" from their appearance. I am concerned about the uncertainty and the far-reaching impact of the court's decision.

D. Conclusion

Obesity is a disability for purposes of the WLAD when (a) the plaintiff's obesity is medically cognizable, medically diagnosable, exists as a record or history, or is perceived to exist whether or not it actually does and (b) the plaintiff's obesity impairs one or more body systems listed in RCW 49.60.040(7)(c)(i). The majority's answer to the certified questions, that obesity is *always* an impairment for purposes of the WLAD, ignores the need for an individualized inquiry. Therefore, I respectfully dissent.

_____

John McCloy, J.