[No. 28383-2-II. Division Two. December 9, 2003.]

SUPPORTERS OF THE CENTER, INC., *Respondent*, v. GARY MOORE, *as Director of The Department of Labor and Industries,* ET AL., *Appellants,* TIM DOUGLAS, *as Director of The Department of Community, Trade, and Economic Development,* ET AL., *Respondents,*PACIFIC NORTHWEST COUNCIL OF CARPENTERS, ET AL., *Appellants.*

*Christine O. Gregoire, Attorney General*, and *Amanda J. Goss, Anastasia R. Sandstrom*, and *Richard A. McCartan, Assistants*; and *Richard H. Robblee* (of *Rinehart & Robblee*), for appellants.

*Kathleen D. Benedict* and *Erik D. Price* (of *Lane Powell Spears Lubersky, L.L.P.*); and *Christine O. Gregoire, Attorney General*, and *Richard A. McCartan, Assistant*, for respondents.

QUINN-BRINTNALL, J. — In this case we are asked to decide whether the Bank of America Performing Arts Center (Center) in Wenatchee, Washington, is a public work and required to pay its workers a statutory prevailing wage under RCW 39.04.010 and RCW 39.12.020. We hold that it is and reverse.

## FACTS

Supporters of the Center, Inc. (SOC) is a nonprofit corporation formed to raise money for, construct, and manage the Center in Wenatchee. Although SOC had initially purchased a different parcel on which to build the Center,

SOC's architectural firm suggested building the Center on city property next to the existing Convention Center. In May 1998, SOC and the city of Wenatchee (City) executed a 30-year "ground lease" for this land at a rent of $17,250 per year. The lease was to begin on January 1, 2000, and included two 10-year options that could extend the term up to 50 years. At the end of the lease, the improved property will belong to the City.

Construction costs for the project totaled $6.1 to $6.2 million, with an additional $800,000 to $900,000 for permits, project management, utility hookup, and architectural costs.[1]

In 1997, the legislature appropriated $2.97 million through the Department of Community, Trade, and Economic Development (CTED) for the project, directing that the funds be disbursed by CTED as part of its Building for the Arts program.[2] The parties stipulate that the $2.97 million in state funds "represents less than half of the center's total cost."[3] Clerk's Papers (CP) at 223.

In August 1998, Intervenor Pacific Northwest Regional Council of Carpenters (Intervenor) filed an "interested party complaint" with the Department of Labor and Industries (L&I), alleging that SOC was not complying with the prevailing wage laws. Ultimately, L&I's director determined that the Center was a public work and that SOC contractors were required to pay prevailing wages.

---

[1] In addition to these direct costs, there were indirect expenses for such things as fundraising, interest, development, and administration; however, the parties do not specify the amount of these costs.

[2] The legislature's actual appropriation was $3 million; CTED retained one percent of that amount for its administrative costs. The Building for the Arts program existed in the 1990s to assist in construction of specified arts-related private construction projects and is now codified at RCW 43.63A.750. Under the program, CTED recommended projects for funding to the legislature. SOC applied for program funds in 1996.

[3] In addition, the parties' joint stipulation provides that the City paid $700,000 to the project in the form of "advance rent" after SOC determined it could not complete the project without additional funds. The advance rental amount was calculated on a projected 45 days use per year for 30 years (whether used or not) and paid monthly on a percentage of completion basis. The City also agreed to pay an additional $400 per day of actual Center use to cover SOC's operating costs.

SOC sought review of the director's decision in the Chelan County Superior Court on April 24, 2000. SOC requested a declaratory judgment, injunctive relief, damages through regulatory takings, and damages under the prevailing wage statutes (chapters 39.04 and 39.12 RCW). CTED[4] obtained a change of venue to the Thurston County Superior Court. Following SOC's ex parte motion, the court dismissed the declaratory judgment action without prejudice in September 2001.[5]

The Thurston County Superior Court reversed the director's decision, ruling that SOC is a private, nonprofit organization; that the project was executed at the cost of SOC, not the State; and that therefore the project is not subject to prevailing wage laws. L&I and Intervenor appeal.

## ANALYSIS

STANDARD OF REVIEW

 Whether the prevailing wage requirements of RCW 39.12.020[6] and RCW 39.04.010[7] apply to a project is a legal question that we review de novo to determine whether the

---

[4] CTED argues in its amicus brief that it should not be responsible for paying prevailing wage because it was named only in the declaratory judgment action, which the trial court dismissed. It is not clear from the director's decision which party is responsible for the wages, and the director did not mention in his ruling the account SOC and contractor Leone & Keeble created to cover payment of the prevailing wage differential. Ordinarily L&I seeks unpaid wages from the contractor. RCW 39.12.065, .050. In April 1999, Leone & Keeble, SOC, and L&I agreed that any alleged difference in pay owed to the workers would be placed in an account pending a final determination of the matter. Thus it does not appear that CTED will be held responsible for any underpayment.

[5] The judge had apparently expressed concern over whether SOC's claims fell under the superior court's appellate jurisdiction, under the Administrative Procedure Act (chapter 34.05 RCW), or under its original jurisdiction, under the Uniform Declaratory Judgments Act (chapter 7.24 RCW).

[6] RCW 39.12.020 provides in part:
The hourly wages to be paid to laborers, workers, or mechanics, upon all public works and under all public building service maintenance contracts of the state or any county, municipality or political subdivision created by its laws, shall be not less than the prevailing rate of wage for an hour's work in the same trade or occupation in the locality within the state where such labor is performed.

director "erroneously interpreted or applied the law." RCW 34.05.570(3)(d); *City of Spokane v. Dep't of Labor & Indus.*, 100 Wn. App. 805, 810, 998 P.2d 913 (2000). But because application of the prevailing wage laws involves " 'utilization of the specialized knowledge and judgment of the director of [L&I],' "[8] we give deference to the director's decision. *See Superior Asphalt & Concrete Co. v. Dep't of Labor & Indus.*, 84 Wn. App. 401, 405, 929 P.2d 1120 (1996), *review denied*, 132 Wn.2d 1009 (1997).

Public works projects include those projects that are either executed at the cost of the state or other government entity or those that are subject to a lien or charge on public property: "The term public work shall include all work, construction, alteration, repair, or improvement other than ordinary maintenance, executed at the cost of the state or of any municipality, or which is by law a lien or charge on any property therein."[9] RCW 39.04.010.

Minimum or "prevailing" wages must be paid for public works:

---

[7] RCW 39.04.010 states in relevant part:

The term public work shall include all work, construction, alteration, repair, or improvement other than ordinary maintenance, executed at the cost of the state or of any municipality, or which is by law a lien or charge on any property therein. All public works, including maintenance when performed by contract shall comply with the provisions of RCW 39.12.020. The term does not include work, construction, alteration, repair, or improvement performed under contracts entered into under RCW 36.102.060(4) or under development agreements entered into under RCW 36.102.060(7) or leases entered into under RCW 36.102.060(8).

The term contract shall mean a contract in writing for the execution of public work for a fixed or determinable amount duly awarded after advertisement and competitive bid. However, a contract which is awarded from a small works roster need not be advertised.

[8] *City of Spokane*, 100 Wn. App. at 810-11 (quoting *S.E. Wash. Bldg. & Constr. Trades Council v. Dep't of Labor & Indus.*, 91 Wn.2d 41, 47, 586 P.2d 486 (1978)).

[9] The Intervenor argues that the Center is subject to a lien on public property, an alternative criterion for being considered a public work under RCW 39.04.010; SOC disagrees, explaining that liens cannot attach to public land, and instead the retainage act (chapter 60.28 RCW) provides protection for mechanics and others who perform work on public lands. The director did not address this alternative in his decision, and because we hold that the Center was executed at the cost of the State, we do not address this issue.

The hourly wages to be paid to laborers, workers, or mechanics, upon all public works and under all public building service maintenance contracts of the state or any county, municipality or political subdivision created by its laws, shall be not less than the *prevailing rate of wage* for an hour's work in the same trade or occupation in the locality within the state where such labor is performed.

RCW 39.12.020; *City of Spokane*, 100 Wn. App. at 811.

The "prevailing rate of wage" is "the rate of hourly wage, usual benefits, and overtime paid in the locality . . . to the majority of workers, laborers, or mechanics, in the same trade or occupation." RCW 39.12.010(1). This rate is determined by L&I's industrial statistician. RCW 39.12.015.

■ The prevailing wage act (chapter 39.12 RCW) is remedial, and we construe it liberally " 'to protect the employees of government contractors from substandard earnings and to preserve local wage standards . . . . The employees, not the contractor or its assignee, are the beneficiaries of the Act.' " *Everett Concrete Prods., Inc. v. Dep't of Labor & Indus.*, 109 Wn.2d 819, 823, 748 P.2d 1112 (1988) (quoting *Unity Bank & Trust Co. v. United States*, 756 F.2d 870, 873 (Fed. Cir. 1985)).[10]

EXECUTED AT THE COST OF THE STATE

■ In determining whether a project is a public work required to pay prevailing wages, we look first to whether the project was "executed at the cost of the state." *See* RCW 39.04.010.[11] There is no bright-line definition of when a project is executed at the cost of the State. Appellant L&I

---

[10] Our prevailing wage law is modeled on the federal Davis-Bacon Act, formerly codified at 40 U.S.C. § 276a. *See Everett*, 109 Wn.2d at 824. Although our courts have noted some important textual differences between the two acts, they find cases interpreting Davis-Bacon helpful in interpreting Washington's prevailing wage law. *See Everett*, 109 Wn.2d at 824. Davis-Bacon was recodified in 2002. *See* Pub. L. No. 107-217, 116 Stat 1150 (codified as enacted at 40 U.S.C. §§ 3141-3147 (2002)).

[11] The language of the regulation defining public work is similar:

The term "public work" shall include:

(i) *All work, construction,* alteration, enlargement, improvement, repair, and/or demolition *that is executed by contract,* purchase order, or any other legal agreement and *that is executed at the cost of the state of Washington or of*

would define a public work as simply a project executed at the cost of the state, provided the state funding for the project is substantial. SOC points to the statutory scheme of the public works act (chapter 39.04 RCW) and argues that unless a governmental entity is a party to the contract, the project is not a public work. In effect, SOC is claiming that unless a project is subject to all the requirements of the act, such as public bidding and duties of the awarding agency, it is not a public work and it need not pay a prevailing wage. But we look to both the source of the funding and the character of the project in deciding whether it is executed at the cost of the State.

Two cases guide whether a project is a public work.

In *Drake v. Molvik & Olsen Electric, Inc.*, 107 Wn.2d 26, 726 P.2d 1238 (1986), our Supreme Court held that the Seattle Housing Authority was subject to prevailing wage requirements when it constructed low income housing with federal funds. 107 Wn.2d at 28-29. *Drake* held that "[t]he source of the funding [meaning federal, not state funds] does not determine the applicability of the prevailing wage statute." 107 Wn.2d at 29.

In *City of Spokane*, we addressed whether the prevailing wage law applied to annual maintenance performed on Spokane's privately-operated solid waste disposal facility. 100 Wn. App. 805. The private company had total control over the performance of maintenance. Nevertheless, we held that the maintenance was "executed at the cost of" the City because "the . . . facility is owned by the City, paid for with public funds, and operates to benefit the public." *City of Spokane*, 100 Wn. App. at 812. We also explained that Washington's statutory definition of "public work" does not

*any municipality*. The source of the funding shall not determine the applicability of the statute, and may include, but is not limited to, such sources as those payments made through contracts with insurance companies on behalf of the insured state or municipality;

(ii) All work, construction, alteration, enlargement, improvement, repair, and/or demolition which, by law, constitutes a lien or charge on any property of the state or of a municipality.

WAC 296-127-010(7)(a) (emphasis added).

require the governmental agency's direct involvement in the work performed; rather, it requires only that the work be "executed at the cost of" the governmental entity. *City of Spokane*, 100 Wn. App. at 814-15.

 Here, of the total direct building cost, at least $3.67 million ($2.97 million legislative appropriation and $700,000 city payment of advance rent) out of a total construction cost of approximately $7 million, or more than 52 percent, came from governmental entities. If the only criterion for qualifying as a project "executed at the cost of the state or of any municipality" (RCW 39.04.010) is substantial state funding, then the Center project clearly qualifies as a public work.

But additional criteria characterize the Center as a public work. The Center sits on land owned by and leased from the City. In 30 to 50 years, at most, Center ownership will transfer from SOC to the City. Operation of the Center requires simultaneous access and use of preexisting publicly owned lobby, restrooms, elevators, parking lot, and an *outdoor plaza belonging to the City's Convention Center.*

In addition to the substantial taxpayer money used to fund the project, SOC and CTED entered into a capital contract specifying that as part of the project SOC must build a performing arts center *and make improvements to the City-owned Convention Center with the funds*. This contract and the City's detailed involvement in the construction (and running of) the Center reveal the public nature of the project. As such, the record amply supports the director's decision that the Center was a public work project:

> Examination of the "Capital Contract" between CTED and SOC for distribution of the $3,000,000 legislative appropriation, further demonstrates that the Performing Arts Center is, in many ways, constructed in the manner one would expect of a public, not a private, facility. . . . Th[e] contractual language shows that the City of Wenatchee and SOC contemplated a close, ongoing relationship between the City owned and run Convention Center and the completed Performing Arts Center

and that the state funding is contingent upon that relationship. . . .

. . . .

. . . The completed Performing Arts Center will serve a valuable public purpose and will be an important public asset for the residents of the City of Wenatchee.

CP at 207.

## CONCLUSION

The Center was built with substantial state and municipal funds on leased public land. Ownership of the Center will revert to the city of Wenatchee in a maximum of 50 years. The Center cannot be used independently of the adjacent City-owned convention facilities. Thus, L&I's director properly concluded that the Center was a public work and required to pay prevailing wages under RCW 39.04.010 and RCW 39.12.020. We reverse the decision of the superior court and remand to the court with instructions that it reinstate the director's decision.

HUNT, C.J., and BRIDGEWATER, J., concur.