IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| GLACIER NORTHWEST, INC., | No. 85660-0-I |
| Appellant, | |
| v. | DIVISION ONE |
| WASHINGTON STATE DEPARTMENT OF LABOR AND INDUSTRIES, | PUBLISHED OPINION |
| Respondent, | |
| INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 302, | |
| Intervenor-Respondent. | |

DíAZ, J. — In 2018, the Department of Labor and Industries (L&I) determined Glacier Northwest Inc. (Glacier) violated the Prevailing Wage Act (PWA), chapter 39.12 RCW, by failing to adequately pay workers at a disposal site processing "tunnel spoils" from the State Route 99 (SR99) tunnel project in Seattle. Glacier filed an administrative appeal. In 2023, L&I's director issued an order (the director's order) upholding the determination. Among other arguments, Glacier contends the director applied the wrong legal standard, their order was contrary to the PWA's implementing regulations, and was arbitrary and capricious. We affirm

the director's order.

## I.     BACKGROUND

Glacier defines itself as "a material supply company that sells and delivers concrete and aggregate (sand and gravel) materials."  As part of these operations, Glacier owns a private quarry named "Mats Mats" near Port Ludlow, Washington. Mats Mats is a reclamation project, meaning Glacier refills the excavated landscape with new soils for future development.

Three contracts are relevant to this appeal.  First, the Washington State Department of Transportation (WSDOT) contracted with Seattle Tunnel Partners (STP) in 2010 to replace the Alaskan Way Viaduct on SR99 with a tunnel.  Second, STP contracted with Glacier in 2012 to "receive, manage, handle, store and/or dispose of" tunnel "spoils" or "clean soil,"[1] excavated from the SR99 site at Mats Mats, in a manner that will be described further below.  Finally, STP contracted with Foss Maritime (Foss) to transport spoils from the SR99 site to Mats Mats by barge.

Glacier processed SR99 tunnel spoils at Mats Mats from 2012 to 2017. Specifically, workers at Mats Mats accepted and manipulated the spoils from barges operated by Foss by utilizing a system of cranes, hoppers, conveyers, and trucks.  During the project, Mats Mats workers handled millions of tons of tunnel spoils delivered from the SR99 site.

---

[1] Per the STP-Glacier contract, Glacier was "authorized to accept only 'Clean Soil'" which is contractually defined as "clean earthen material or soil, clay, sand, gravel, or rock smaller than 18 inches in diameter" which "*cannot* contain any construction or demolition waste" or other types of "hazardous" or "toxic" waste.

In June 2016, the International Union of Operating Engineers, Local 302 (IUOE) filed a complaint with L&I alleging Glacier had violated the PWA. In a subsequent declaration, the IUOE claims it had alerted Glacier about its failure to comply with the PWA before work commenced at Mats Mats.

L&I investigated and determined Glacier had failed to pay $370,666.08 in prevailing wages to forty-six Mats Mats workers. In December 2018, L&I issued a notice of violation against Glacier.[2] In January 2019, Glacier appealed the notice to L&I's Office of Administrative Hearings. Both Glacier and L&I moved for summary judgment.

Over three years later, in June 2022, an L&I Administrative Law Judge (ALJ) granted summary judgment in favor of Glacier and denied L&I's cross motion. The ALJ reasoned that "[b]eyond removal it was up to STP to arrange where it was removed to, and admittedly, neither STP nor WSDOT had any control over what happened to the dirt from that point forward," meaning "Glacier employees did not perform work on a public work." In July 2022, L&I appealed the ALJ's order to L&I's director.

In February 2023, the director reversed the ALJ's order, granting summary judgment in favor of L&I and denying Glacier's motion. In sum, the director

---

[2] In addition to prevailing wage violations, L&I determined Glacier had failed to pay workers overtime and failed to file required documentation, which are not at issue in this appeal. For all these violations, L&I imposed $75,633.22 in penalties and fees on top of requiring payment of the $370,666.08 in prevailing wages. The notice of violation also stated that, if these violations are upheld, Glacier would be precluded from bidding on public work contracts for a period of time and earn a "strike" towards debarment. Earning two strikes by committing certain offenses within a five-year period, the notice further advised, could result in a further ban on bidding for public contracts.

reasoned that STP's contracts with both WSDOT and Glacier "show . . . that disposal was directly related to the prosecution of public work" and that the disposal work "was essential to the tunnel bore project."

Glacier then petitioned the superior court for review of the director's order, and the court directly transferred the petition to this court.

## II.    ANALYSIS

### A.    Standard and Principles of Review

The Administrative Procedure Act (APA), chapter 34.05 RCW, governs review of a final decision by the director of L&I. Silverstreak Inc. v. Dep't of Labor & Indus., 159 Wn.2d 868, 879, 154 P.3d 891 (2007) (citing RCW 34.05.510). This court is required to grant relief if, among other reasons, the director either erroneously interpreted or applied the law or the order is not supported by substantial evidence. Id. (citing RCW 34.05.570(3)(d)-(e)). In reviewing an administrative decision, this court applies the APA standards directly to the record before the administrative tribunal. Id.

"An agency's findings of fact and its regulatory interpretations are granted deference. However, questions of law are reviewed de novo. Whether the law was correctly applied to the facts as found by the agency is also a question of law that we review de novo. We review an agency's decisions on summary judgment de novo." Id. at 879-80 (internal citations omitted). "When reviewing denial of summary judgment, this court makes the same inquiry as the [agency], i.e., summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Facts and

4

reasonable inferences from the facts are considered in the light most favorable to the nonmoving party." Postema v. Pollution Control Hr'gs Bd., 142 Wn.2d 68, 119, 11 P.3d 726 (2000).

Here specifically, "[w]hether the prevailing wage requirements of RCW 39.12.020 and RCW 39.04.010 apply to a project is a legal question that we review de novo to determine whether the director 'erroneously interpreted or applied the law.'" Supporters of Ctr., Inc. v. Moore, 119 Wn. App. 352, 356-57, 80 P.3d 618 (2003) (quoting RCW 34.05.570(3)(d)).

The interpretation of the law here includes questions of statutory construction, where the "'primary goal . . . is to carry out legislative intent.'" Abacus Fine Carpentry, LLC v. Wilson, 16 Wn. App. 2d 112, 116, 480 P.3d 433 (2021) (quoting Cockle v. Dep't of Labor & Indus., 142 Wn.2d 801, 807, 16 P.3d 583 (2001)). "The best evidence of the legislature's intent is the statute's language." Id. "While interpreting a statute, this court 'endeavor[s] to effectuate the legislature's intent by applying the statute's plain meaning, considering the relevant statutory text, its context, and the statutory scheme.'" Echo Global Logistics v. Dep't of Revenue, 22 Wn. App. 2d 942, 947, 514 P.3d 704 (2022) (quoting Olympic Tug & Barge, Inc. v. Dep't of Revenue, 188 Wn. App. 949, 952, 355 P.3d 1199 (2015)).

"If a statute is unambiguous, its meaning must be derived from its language alone." Everett Concrete v. Dep't of Labor & Indus., 109 Wn.2d 819, 822, 748 P.2d 1112 (1988). "If the statute is ambiguous, the court resorts 'to principles of statutory construction, legislative history, and relevant case law to assist [the court]

in discerning legislative intent.'" Taylor v. Burlington N. R.R. Holdings Inc., 193 Wn.2d 611, 617, 444 P.3d 606 (2019) (alteration in original) (quoting Cockle, 142 Wn.2d at 808).

In addition to these general principles of statutory construction, Washington courts have long afforded "substantial weight" or "deference" to L&I on interpreting the scope of prevailing wage law. Everett Concrete, 109 Wn.2d at 823 ("substantial weight"); Superior Asphalt & Concrete v. Dep't of Labor & Indus., 84 Wn. App. 401, 404-05, 929 P.2d 1120 (1996) (hereinafter Superior I) (same); Superior Asphalt & Concrete Co. v. Dep't of Labor & Indus., 112 Wn. App. 291, 296, 49 P.3d 135 (2002) (hereinafter Superior II) (same); Moore, 119 Wn. App. at 356-57 ("deference"); Silverstreak, 159 Wn.2d at 879-80 (same). Such deference is appropriate "because application of the prevailing wage laws involve 'utilization of the specialized knowledge and judgment of the director of [L&I].'" Moore, 119 Wn. App. at 357 (alteration in original) (quoting City of Spokane v. Dep't of Labor & Indus., 100 Wn. App. 805, 810-11, 998 P.2d 913 (2000)).

B.      Applicability of the PWA to Glacier's Work at Mats Mats

Glacier's various challenges to the director's order can be distilled down to a single core question: whether the PWA applies to the work it undertook at Mats Mats pursuant to the broader SR99 project. We hold that it does.

1. Overview of the PWA

The purposes of the PWA are "to protect employees working on public projects from substandard wages and . . . to preserve local wages." Heller v. McClure & Sons, Inc., 92 Wn. App. 333, 338, 963 P.2d 923 (1998). As we

explained in Heller, the government generally awards contracts to the "lowest reasonable bidder" meaning the PWA "is designed to discourage contractors on public works projects from paying substandard wages to the classes of their workers that are described in the [PWA] to underbid competition." Id. at 338; see also RCW 39.04.010(2)[3] ("'Award' means the formal decision by the state or municipality notifying a responsible bidder with the lowest responsive bid of the state's or municipality's acceptance of the bid.").

The PWA intends to benefit workers, not contractors. Superior I, 84 Wn. App. at 406 (citing WAC 296-127-018). As such, the PWA "is remedial legislation"[4] meaning it "and regulations promulgated thereunder are to be liberally construed in favor of the beneficiary of the [PWA], the worker." Silverstreak, 159 Wn.2d at 882. "Exemptions from remedial legislation are to be narrowly construed in a manner that is consistent with the terms and spirit of that legislation." Id.

More specifically, the PWA requires

[t]he hourly wages to be paid to laborers, workers, or mechanics, upon all *public works* and under all public building service maintenance contracts of the state or any county, municipality or political subdivision created by its laws, shall be not less than the prevailing rate of wage for an hour's work in the same trade or occupation in the locality within the state where such labor is

---

[3] The legislature recently amended this statute and changes went into effect on July 1, 2024. LAWS OF 2023, ch. 392, § 29. Because the amendments do not affect our analysis, we use the current version of the statute.

[4] "Remedial statutes generally 'afford a remedy, or better or forward remedies already existing for the enforcement of rights and the redress of injuries.'" Bayless v. Cmty. Coll. Dist. No. XIX, 84 Wn. App. 309, 312, 927 P.2d 254 (1996) (quoting Haddenham v. State, 87 Wn.2d 145, 148, 550 P.2d 9 (1976)). "A statute is remedial when it relates to practice, procedure, or remedies and does not affect a substantive or vested right." Miebach v. Colasurdo, 102 Wn.2d 170, 181, 685 P.2d 1074 (1984).

performed.[5]

RCW 39.12.020 (emphasis added).

"'Public work' means all work, construction, alteration, repair, or improvement other than ordinary maintenance, *executed at the cost of the state* or of any municipality, or which is by law a lien or charge on any property therein." RCW 39.04.010(5) (emphasis added).  When applying the PWA, "[t]here is no bright-line definition of when a project is *executed at the cost of the State*. . . . we look to *both* the *source of the funding* and the *character of the project* in deciding whether it is executed at the cost of the State."  Moore, 119 Wn. App. at 358-59 (emphasis added).  As will be discussed further below, the parties do not contest that the source of the funding ultimately is the WSDOT-STP contract.

This court has held that, when determining the character of the project, "Washington's statutory definition of 'public work' does not require the governmental agency's direct involvement in the work performed; rather, it requires only that the work be 'executed at the cost of' the governmental entity."  Id. at 359-60 (quoting City of Spokane, 100 Wn. App. at 814-15).  And this court concluded the project in Moore was a public work as it, not only benefited from "substantial State funding," but also met numerous "additional criteria" indicative of a public work, including the project's connection to public land and services and the

_____

[5] The PWA defines "prevailing rate of wage" in pertinent part as "the rate of hourly wage, usual benefits, and overtime paid in the locality, as hereinafter defined, to the majority of workers, laborers, or mechanics, in the same trade or occupation." RCW 39.12.010(1).  The PWA defines "locality" as "the largest city in the county wherein the physical work is being performed."  RCW 39.12.010(2).  Glacier does not dispute that it failed to pay wages equivalent to the locality in question, but disputes that it is required to do so.

obligations laid out in the contractual terms of the project.  Id. at 360-61.

Conceptually similar to the "character" factor, this court has also held that "the more appropriate factor to focus on in considering whether the [workers there] [we]re entitled to the prevailing wage for [their work] is the *purpose* for which the" work was done.  Superior II, 112 Wn. App. at 302.  Even more specifically, this court has held that the PWA applies when the "work directly relates to the *prosecution* of the work that is contracted to be performed and *necessary for the completion* of that work."  Heller, 92 Wn. App. at 340 (emphasis added).

Finally, numerous regulations in chapter 296-127 WAC implement the PWA, including:

- WAC 296-127-010(7)(a)(i), which tracks the language of RCW 39.04.010(4), and adds expressly that the "source of the funding shall not determine the applicability of the statute."

- WAC 296-127-010(5), which provides a three-part definition for "contractor."  In pertinent part, the term includes prime and subcontractors that are required to be registered, licensed, or required to pay industrial insurance premiums and that "that perform[] any work *on* a public works project site."  Id. at (5)(a) (emphasis added).

- WAC 296-127-018, which discusses the PWA's coverage of workers involved in the production and delivery of gravel, concrete, asphalt, or similar materials.  This includes directly *delivering* materials to the locations where the materials are then incorporated into the project, *removing* materials from a public works site, working in a materials production facility, or otherwise assisting in the incorporation of materials *into* the project.  Id. at (2)(a)-(f) (emphasis added).

- WAC 296-127-01354(1)(a), which discusses the PWA's coverage of operating engineers, indicating that it includes, but is not limited to, "reclamation" among many other examples.

2. Glacier's Arguments Against Application of the PWA

By way of initial response, Glacier cites to an April 2017 email from Nielsen

in which he claims prevailing wages "would not be appropriate" for the work at Mats Mats. Glacier also cites to the deposition of Jim Christensen, who served as L&I's industrial statistician and prevailing wage program manager, and who similarly opined. Based on these statements, Glacier seems to suggest that L&I has somehow conceded the issue. Nielsen and Christensen's personal opinions on prevailing wages, while informed, are in no way binding on L&I or determinative of the issue. Both certainly were quite familiar with the SR99 project. However, the legislature gave L&I's *director* the ultimate responsibility of administering the PWA, not Nielsen or WSDOT. RCW 39.12.065. And it is this court's ultimate responsibility to review the applicability of the PWA de novo. Moore, 119 Wn. App. at 356-57. Thus this argument is unpersuasive.

Glacier next argues that the "character" of the project was not a "public work" by relying primarily on two regulations, WAC 296-127-010(5)(a) and WAC 296-127-018.

a. On Site Work as Defined by WAC 296-127-010

WAC 296-127-010(5)(a) defines a contractor as one who "performs any work *on* a public works project site" for purposes of the PWA. Glacier argues that the regulation did not intend to capture its work at issue here because Mats Mats is not on the site of the SR99 project. To support its argument, Glacier relies on the principle of statutory interpretation that, "[w]here a statute or regulation specifically designates the things or classes of things on which it operates, an inference arises in law that all things or classes of things omitted from it were intentionally omitted." In other words, Glacier is invoking the maxim of *expressio*

*unius est exclusio alterius*. Wash. State Labor Council v. Reed, 149 Wn.2d 48, 58, 65 P.3d 1203 (2003) (defining the maxim to mean "express mention of one implies exclusion of all others"). This argument is unavailing for three reasons.

First, our Supreme Court has stated this exclusionary maxim is subordinate to legislative intent. O.S.T. v. Regence BlueShield, 181 Wn.2d 691, 701, 335 P.3d 416 (2014). That is, "this maxim 'cannot be rigidly applied to . . . defeat the intent of the legislature,'" which is the primary goal of statutory interpretation. Reed, 149 Wn.2d at 59 (quoting State v. Williams, 94 Wn.2d 531, 538, 617 P.2d 1012 (1980)). Thus we need not look to secondary principles of statutory construction when our interpretation of the legislative intent of the statute based on its plain language is so clear.

Second, our Supreme Court has held the PWA's scope which includes work "'upon *all* public works'" is broader than that of its federal counterpart, the Davis-Bacon Act, which includes only work "'*directly* upon the site of the work.'" Everett Concrete, 109 Wn.2d at 826 (emphasis added) (latter alteration in original) (quoting RCW 39.12.020; 40 U.S.C. § 276a). Additionally, the Davis-Bacon Act applies only to employees of contractors and subcontractors, while the PWA encompasses any "'other person doing or contracting to do the whole or any part of the work contemplated by the contract.'" Id. at 829 (quoting RCW 39.12.030). Thus, Glacier's argument may resonate under federal law, but not under the PWA. Even more specifically, our Supreme Court held in Everett Concrete that the PWA "must be construed to require application of the prevailing wage requirement to off-site manufacturers, when they are producing nonstandard items specifically for a

11

public works project. In this way the use of cheap labor from distant areas is avoided and the purpose of RCW 39.12 is not circumvented." Id. at 831-32. However, the court did not appear to so limit off-site coverage solely to the manufacture of nonstandard items. Id. at 824. Instead, it held that the broader aim was "preventing contractors from parceling out portions of the work to various off-site manufacturers as a means of avoiding the prevailing wage requirement." Id. Thus, the distinction between on-site work or off-site work is not dispositive; rather, the question is whether the work is "contemplated" by a public works project. Id. at 829. As will be explained in greater detail in Part 3 of this opinion, the parties clearly contemplated disposal work at Mats Mats for the SR99 project.

Finally, our Supreme Court also rejected another similar maxim in reviewing the PWA, namely the maxim of *ejusdem generis*.[6] Silverstreak, 159 Wn.2d at 883. The court reasoned that the "use of the rule in this case does not, in our view, advance the intent of the legislature . . . because application of the canon here would serve to exclude a number of workers from the protection of the [PWA]." Id. "The careful dictation of drivers' activities in this case, designed to use them as much as possible without having to pay prevailing wages, suggests that contractors might be willing to take advantage of such a loophole" which "would force local dump truck drivers to accept lower wages or forgo working on government contracts." Id. In other words, applying the maxim would "undermine

---

[6] "The rule of ejusdem generis requires that general terms appearing in a statute in connection with specific terms are to be given meaning and effect only to the extent that the general terms suggest similar items to those designated by the specific terms." Silverstreak, 159 Wn.2d at 882.

the legislature's intent to protect workers." Id.

If we accepted Glacier's proffered exclusionary maxim, we would run the same risks as those noted in Silverstreak. Taken to its logical extreme, if we rigidly excluded every activity not expressly listed in the PWA or its regulations, we would require L&I and the legislature to painstakingly list every potential occupation in every conceivable context. So used, this maxim would undermine the PWA's clear words and purpose, to protect "laborers, workers, or mechanics, upon *all* public works" from substandard wages. RCW 39.12.020; Heller, 92 Wn. App. at 338.

b. Use of "Remove" in WAC 296-127-180

Relying on another WAC provision of the PWA, Glacier argues that, for prevailing wages to apply, its workers must have "removed" materials from a public site or worked for the specific purpose of "supplying materials" to the project. WAC 296-127-018(2)(c). We disagree.

Washington courts have routinely rejected requiring such an inflexible nexus with the public worksite. Everett Concrete, 109 Wn.2d at 831-32 (rejected an on-site, off-site distinction in order to prevent parceling of work); Heller, 92 Wn. App. at 340 (rejected an argument that work must be "incorporated into" the site for prevailing wages to apply); Moore, 119 Wn. App. at 359-60 (reiterated the principle that the agency or government need not be directly involved in work). We now also refuse to create such a black-and-white standard here for the first time. Further, we do not view WAC 296-127-018(2)(c) in isolation. City of Auburn v. Gauntt, 174 Wn.2d 321, 330, 274 P.3d 1033 (2012) ("[W]hen interpreting statutes, we do not read words in isolation. We read words within the context of the whole

statute and larger statutory scheme."). As explained above, the PWA's broader purpose is preventing substandard wages. Heller, 92 Wn. App. at 341. That "liberal" intent is not honored if we create such a blinkered standard. Silverstreak, 159 Wn.2d at 882.[7]

Moreover, it is also notable that "operating engineers"[8] *are* engaging in covered work within the PWA's regulations. WAC 296-127-01354. In fact, the regulation lists "reclamation" as an example within the "[h]eavy and highway" category of construction. WAC 296-127-01354(1)(a). As seen in Glacier's own proposals for the Mats Mats site and subsequent employee testimony, it accepted spoils which required cranes and other heavy equipment. Additionally, Mats Mats is simply a reclamation project. Thus, Glacier's interpretation of that regulation would be in irreconcilable conflict with this later regulation.[9]

3. The PWA Applies to Glacier's Work on the SR99 Project

Glacier also expressly contends that the director's order incorrectly determined that the PWA's obligations applied to Glacier's role in the SR99 project. Glacier first argues that the director erred by solely basing his decision on whether

---

[7] In this appeal, IUOE filed a brief as an intervenor. They adopt L&I's arguments with the exception that they separately argue for a third interpretation of WAC 296-127-018(2)(c)'s coverage of the removal of excavated material. We need not reach this argument.

[8] In pertinent part, the regulation defines operating engineers as those who "operate, repair and maintain all types of self-propelled mechanically, electrically, electronically, hydraulic, automatic or remote controlled equipment on construction projects." WAC 296-127-01354.

[9] Glacier also intermittently cites to numerous amendments made to the PWA and its regulations over the previous decades. However, we only resort to legislative history if the statute is ambiguous. Taylor, 193 Wn.2d at 617. The statute is not ambiguous and thus we need not resort to legislative history.

the work was "at a cost to the state." This claim is factually incorrect. The director's order also examined whether the work at Mats Mats was "essential" to the project and whether the relevant contracts "specifically contemplated" removal. In other words, the director rightly considered "both the source of the funding and the character of the project." Moore, 119 Wn. App. at 359.

Regardless, our review is de novo, though we give deference to the agency's interpretation. Id. at 357. As such, we review the work at Mats Mats by considering both the source of the funding and the character of the project. Id. at 359.

Starting with the source of funding factor, again, there is no dispute that the funding of the STP-Glacier contract originated from the WSDOT-STP contract. The WSDOT-STP contract included all funds required to build the tunnel, including disposal. For this work, Glacier received an advance payment of $5,148,000 plus an additional per unit rate of $12.89. In total, Glacier received $28,350,000.00. There is no evidence in the record of Glacier receiving funding for its work at Mats Mats from any other source. Thus, this factor supports the final determination in the director's order.

Our inquiry does not end there, however, because as stated in the regulations implementing the PWA, the "source of the funding shall not determine the applicability of the statute." WAC 296-127-010(7)(a)(i); Moore, 119 Wn. App. at 359. Glacier does not challenge the PWA implementation regulations. Accordingly, we must then turn to the latter factor, the character of the project, which is the primary focus of this appeal. We hold—*based on our interpretation of*

15

*the PWA alone*—that the purpose of the disposal work at Mats Mats was both directly related to the prosecution of and necessary for the SR99 project, and thus the character of the project supports the director's determination that it was "executed at cost to the State." Heller, 92 Wn. App. at 340.

As shown by STP's contracts with both WSDOT and Glacier, the parties addressed the disposal of the spoils from the very beginning of the SR99 project. Specifically, STP's proposal and contract with WSDOT contemplated "muck removal." Brian Nielsen, WSDOT's program administrator for the SR99 project, testified that "STP proposed barging the tunnel muck to Mats Mats in Sections 5.2 and 6.2 of its proposal to WSDOT, and identified barging the materials to Mats Mats." In turn and consistent with those provisions, STP's contemporaneous agreement with Glacier made Glacier responsible for handling, receiving, storing, and disposing of the muck or spoils referenced in the WSDOT-STP contract. However even there, STP retained significant control over disposal operations at Mats Mats. Glacier was required to accept all spoils that conformed with the agreement and environmental restrictions and was restricted from assigning portions of this agreement to another party. Further, STP could access Mats Mats for observation and inspection. STP also required Glacier to provide a topographic map of where the spoils were deposited at Mats Mats. Plainly these contracts, when read together, show Glacier's work at Mats Mats was directly related to the prosecution of the SR99 project. Heller, 92 Wn. App. at 340.

The STP-Glacier contract also required Glacier build numerous nonstandard installations at Mats Mats; it built infrastructure at Mats Mats

16

specifically for the purpose of accepting SR99 spoils. This infrastructure included building a conveyer system, dikes, haul roads, as well as utilizing numerous crane and pump systems, which were then torn down after Glacier's part in the SR99 project concluded. And the operators who performed work at Mats Mats were specifically hired to do the SR99 tunnel spoils work, not for other ongoing projects at the site. Moreover, the contracts were performed in such a way as to show the direct relationship between the SR99 project and Glacier's work. Mats Mats' operations moved in unison with the SR99 site. This practice was consistent with the requirement in STP's contract that barred Mats Mats from accepting materials that originated from outside the SR99 project during its duration. When the SR99 project was completed, Mats Mats would also shut down. In all these ways then, Glacier's work was "directly relat[ed] to the prosecution" of the SR99 project, and thus these facts support the director's order finding Glacier's activities at Mats Mats within the scope of the PWA. Heller, 92 Wn. App. at 340.

As to whether Glacier's work was "necessary" for the project, it nearly goes without saying that the creation of an underground tunnel large enough to accommodate high volume vehicle traffic requires removal and disposal of spoils from the work site. Nielsen testified that disposal of tunnel spoils was "certainly" necessary for the SR99 project he oversaw and that STP's proposal to WSDOT identified "barging the materials to Mats Mats as a method to improve safety and reduce impacts to the local roads." There is no evidence creating a genuine issue of material fact to the contrary, and this factor too then supports the director's order.

Taken together then, both "the source of the funding" and "character of the

project support" the director's order. Moore, 119 Wn. App. at 359. To reiterate, we base our decision on the broad terms of the PWA alone as our courts have interpreted the statute previously. Even so, the plain language of the PWA's implementing regulations further supports our decision.

We hold the director's order correctly determined that the PWA applied to Glacier's work at Mats Mats. The purpose of Glacier's disposal work was to support the creation of the tunnel and, thus, was executed at a cost to the state. Superior II, 112 Wn. App. at 302. Stated otherwise, the source of funding and the character of the work demonstrate the work at Mats Mats was "executed at a cost to the state" as it was "directly relat[ed] to prosecution of" and "necessary for the completion" of the SR99 tunneling project. Heller, 92 Wn. App. at 340. Finally, the above outcome supports the PWA's purpose of preventing "substandard wages and . . . to preserve local wages." Id. at 338.

C.    Glacier's Alternate Challenges to the Director's Order

In addition to its assignment of error on the interpretation of the PWA and whether it applies to the work at Mats Mats, Glacier presents a number of alternate bases for reversal of the director's order. However, none of them are availing.

1. Arbitrary or Capricious

"An agency's decision is arbitrary and capricious if the decision is 'willfully unreasonable, without consideration and in disregard of facts or circumstances.' It is not arbitrary and capricious if the decision is 'exercised honestly and upon due consideration, even where there is room for two opinions.'" DeFelice v. Emp't Sec. Dep't, 187 Wn. App. 779, 787-88, 351 P.3d 197 (2015) (quoting W. Ports Transp.,

18

Inc. v. Emp't Sec. Dep't, 110 Wn. App. 440, 450, 41 P.3d 510 (2002)).

Glacier claims the determination set out in the director's order was arbitrary or capricious, first, because it applied the wrong standard, namely, whether the work was "at a cost to the state." However, as explained above, the director also examined whether the work was "essential" to the project and whether the relevant contracts "specifically contemplated" it. As such, the director properly applied the binding authority reviewed above. Additionally, the director gave the facts and circumstances in this case "due consideration," as they methodically laid out their reasoning, including ample references and citation to the record and applicable laws. Glacier's claim on this basis fails.

2. Agency Rulemaking

Glacier next asserts that the director's order must be reversed because, when an agency "attempts to ignore a legislative rule or insert additional requirements, rights, or obligations without rulemaking, the agency action must be invalidated." We disagree with this characterization of the director's order.

"An administrative agency's practice does not qualify as a rule, for purposes of the [APA], when the practice does not create a new standard, formula, or requirement, but simply applies and interprets a statute." Loyal Pig, LLC v. Dep't of Ecology, 13 Wn. App. 2d 127, 145, 463 P.3d 106 (2020). Even if the regulations did constitute such an action, a rule or regulation cannot amend a legislative enactment, meaning rules that are not consistent with the statutes that they implement are invalid. Protect Zangle Cove v. Dep't of Fish & Wildlife, 17 Wn. App. 2d 856, 869, 488 P.3d 894 (2021); Bostain v. Food Exp., Inc., 159 Wn.2d

700, 715, 153 P.3d 846 (2007).  Regardless, as was explained above, the conclusion set out in the director's order was consistent with the PWA itself and its remedial purposes and we need not and did not rely on the regulations or L&I's practices in so reaching.

### 3. Constitutional Claims

Glacier presents four constitutional challenges to the statute: impairment of obligations of contract, vagueness, due process violations, and equal protection violations.  "We presume that statutes are constitutional, and the party challenging the constitutionality of the statute bears the burden of proving unconstitutionality beyond a reasonable doubt."  Associated Gen. Contractors of Wash. v. State, 200 Wn.2d 396, 403, 518 P.3d 639 (2022).

Glacier's vagueness, due process, and equal protection claims, all condensed into a mere five pages, were conclusory or did not follow the prescribed analytic framework and provide argument as to how the controlling law applied to

the facts in this case.[10] We decline to consider these claims.[11] Joy v. Dep't of Labor & Indus.,170 Wn. App. 614, 629, 285 P.3d 187 (2012) (passing treatment of an issue or lack of reasoned argument are insufficient to merit judicial consideration.) The contractual impairment argument, while more fully fleshed out, is separately without merit.

---

[10] As to vagueness, Glacier asserts the director's order was unconstitutional because it imposed the incorrect "at a cost to the state" standard. To the extent this argument is not duplicative of prior arguments already rejected, it also fails because nowhere does Glacier address the rule that "[a] statute is not unconstitutionally vague merely because one cannot predict exactly when his or her conduct would be classified as prohibited." Regan v. Dep't of Licensing, 130 Wn. App. 39, 51, 121 P.3d 731 (2005).

Otherwise, our law requires the courts to apply specific analytic frameworks to certain constitutional claims. See Fields v. Dep't of Early Learning, 193 Wn.2d 36, 45, 434 P.3d 999 (2019) ("Our analysis of Fields's federal procedural due process claim is guided by the Mathews test") (citing Mathews v. Eldridge, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)); State v. Grocery Mfrs. Ass'n, 198 Wn.2d 888, 906, 502 P.3d 806 (2022) (discussing how a party asserting an equal protection claim must first identify which type of classification is implicated and the standard or review). Glacier failed to fulfill its burden of establishing any of these requirements or elements for these three constitutional challenges.

Glacier's equal protection claim is that L&I "singled out only the handling of excavated material at Glacier's disposal as a violation." At oral argument, Glacier's counsel confirmed that their equal protection claim was based on "the selective enforcement against Glacier under the existing law." Wash. Ct. of Appeals oral argument, Glacier Northwest, Inc., v. Dep't of Labor & Indus., No. 85660-0-I (June 4, 2024), at 24 min., 4 sec., through 24 min., 7 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2024061074/?eventID=2024061074. "Mere selectivity in prosecution creates no constitutional problems." City of Spokane v. Hjort, 18 Wn. App. 606, 608, 569 P.2d 1230 (1977). Thus, the equal protection challenge fails for this additional reason.

[11] Glacier also presented, in equally cursory fashion, an equitable estoppel challenge. For reasons similar to the constitutional vagueness, due process, and equal protection arguments, we decline to consider this contention. See Silverstreak, 159 Wn.2d at 887 (enumerating the five required elements of an equitable estoppel defense).

21

Glacier argues that the director's order unconstitutionally impaired its contractual obligations with STP by imposing "new law and standards" contrary to the existing law contemplated at its signing which "did not apply prevailing wage to the acceptance of excavated dirt at offsite disposal pits."

Both the United States and Washington constitutions prohibit laws that impair the obligations of contracts. U.S. CONST. art. 1, § 10; WASH. CONST. art. 1, § 23. The three-part test for whether legislation unconstitutionally impairs a public contract is "(1) whether a contractual relationship exists, (2) whether the legislation substantially impairs the contractual relationship, and (3) if there is substantial impairment, whether the impairment is reasonable and necessary to serve a legitimate public purpose." Wash. Educ. Ass'n v. Dep't of Ret. Sys., 181 Wn.2d 233, 243, 332 P.3d 439 (2014).

There is no dispute that a contractual relationship existed between STP and Glacier. However, Glacier fails to establish substantial impairment by application of the PWA. In gauging whether there is a substantial impairment, it is "[p]articularly relevant . . . whether the subject matter of the contracts had been subject to regulation at the time the contracts were made." Lipscomb v. Columbus Mun. Separate Sch. Dist., 269 F.3d 494, 504 (5th Cir. 2001). The applicable statutes and precedent analyzed herein pre-date Glacier's 2012 contract with STP.

Even assuming *arguendo* there was a substantial impairment, the PWA is reasonable and necessary for a legitimate public interest. As discussed earlier, courts have long upheld the PWA's purpose of guarding against substandard wages and have cautioned against adopting arguments or interpretations that

would create inadvertent loopholes. Heller, 92 Wn. App. at 339 (purposes); Silverstreak, 159 Wn.2d at 883 (warning against creating loopholes or "tempting opportunit[ies]" for circumnavigating the [PWA]).

Further, IUOE alerted Glacier "prior to the commencement of the work of our position that this work was directly related to the Deep Bore work and covered under the [PWA]." IUOE even "authored a [draft] determination request to L&I's former Industrial Statistician requesting a determination," which they offered to submit on Glacier's behalf. In other words, Glacier was hardly blindsided by L&I's later enforcement action.

Regardless, Glacier has not met its "burden of proving unconstitutionality beyond a reasonable doubt." Associated Gen. Contractors of Wash., 200 Wn.2d at 403.

D.    Attorney Fees

Finally, both Glacier and L&I request attorney fees on appeal. The PWA states that a "judicial appeal from the director's determination may be taken in accordance with chapter 34.05 RCW, with the prevailing party entitled to recover reasonable costs and attorneys' fees." RCW 39.12.065. While the PWA does not define "prevailing party," courts have interpreted the phrase to mean the party "that receives judgment in its favor." Harmony at Madrona Park Owners Ass'n v. Madison Harmony Dev., Inc., 160 Wn. App. 728, 740, 253 P.3d 101 (2011). L&I, and not Glacier, is the prevailing party and is facially entitled to its reasonable costs and attorney fees expended on appeal and below. However, Glacier challenges L&I's fee request, arguing that L&I is not a "party" and that it would be improper to

23

force citizens to pay the government's fees, relying on S. Bay Rod & Gun Club, Inc. v. Bonta, 646 F. Supp. 3d 1232, 1239 (S.D. Cal. 2022).

Indeed, the court in Bonta observed that "the threat of being ordered to pay the government's attorney's fees and costs in a non-frivolous § 1983 action to vindicate Second Amendment rights substantially chills First Amendment rights" when striking down a California fee shifting law[12] in the context of a Second Amendment challenge. 646 F. Supp. 3d at 1239, 1245. The Bonta court's analysis was squarely focused on the chilling of a specific constitutional right, one rooted in the First Amendment, in defense of another such right stemming from the Second Amendment, neither of which Glacier has alleged here. In addition to being non-binding on this court, Bonta is simply inapposite.

The PWA itself also contains no restriction on which party may recover attorney fees, unlike other statutes. Compare RCW 39.12.065 with RCW 49.46.090 (where the Minimum Wage Act expressly limits fees to employees); see also RCW 69.50.505(g) (Uniform Controlled Substances Act's section on property seizures expressly limits fees to claimants). Accordingly, in several PWA cases, this court has held that a government "that prevails on a summary judgment motions and prevails on appeal in a public works contract case may be awarded attorney fees on appeal under RCW 39.04.240." Realm, Inc. v. City of Olympia, 168 Wn. App. 1, 12-13, 277 P.3d 679 (2012). Thus, the PWA imposes no general

---

[12] The California law at issue there stated that any party who seeks to "prevent this state . . . or a person in this state from enforcing any statute . . . or any other type of law that regulates or restricts firearms . . . is jointly and severally liable to pay the attorney's fees and costs of the prevailing party." Bonta, 646 F. Supp. 3d at 1236 n.5 (citing Cal. Code Civ. Proc. § 1021.11).

bar on the government receiving attorney fees.  In turn, L&I is entitled to its fees both on appeal and those in pursuit of the "judgment in its favor."  <u>Harmony</u>, 160 Wn. App. at 740.

## III.    CONCLUSION

We affirm the director's order granting L&I's motion for summary judgment and grant L&I's fee request, which may be perfected before a commissioner of this court upon compliance with RAP 18.1.

_____
Díaz, J.

WE CONCUR:

_____        _____
Chung, J.                                                      Hazelrigg, ACJ